## ALLEGHENY ENERGY, INC., Plaintiff,

v.

## DQE, INC., Defendant.

No. 2:98CV01639.

United States District Court, W.D. Pennsylvania.

Dec. 3, 1999.

**484**

Sullivan & Cromwell, New York, NY, for Plaintiff.

Jennifer Wilson Hewitt, Riley, McNulty, Hewitt & Sweitzer, Pittsburgh, PA, Douglas M. Kraus, Seth M. Schwartz, Joseph Sacca, Skadden, Arps, Slate, Meagher & Flom, New York, NY, for Defendant.

Tanya J. McCloskey, Stephen J. Keene, Office of Consumer Advocate, Harrisburg, PA, for Amicus Pennsylvania Office of Consumer Advocate.

Bohdan R. Pankiw, David E. Screven, Karen O. Moury, Pennsylvania Public Utility Commission, Harrisburg, PA, for Pennsylvania Public Utility Comm'n.

William M. Wycoff, David E. White, Thorp, Reed & Armstrong, Pittsburgh, PA, John L. Hardiman, Fraser L. Hunter,

TABLE OF CONTENTS

I. Findings of Fact ................................................. 485
   A. The Parties ................................................ 485
   B. Jurisdiction and Venue ..................................... 485
   C. Deregulation of Electric Utilities in Pennsylvania .......... 485
   D. Background of the Merger ................................... 487
   E. The Merger Agreement....................................... 488
      1) Representations and Warranties ......................... 489
         a) Parties' Understanding of MAE Proviso .............. 491
      2) Conditions to Consummation of the Merger............... 491
      3) Right of Termination .................................. 492
   F. The Restructuring Proceedings ............................. 492
      1) Background ............................................ 492
      2) The PECO Decision ..................................... 493
      3) The January 12, 1998 Noia and Marshall Meeting ........ 495
      4) Allegheny'sReaction to DQE's Urging to Sale ........... 496
      5) West Penn's and Duquesne's Restructuring Proceedings .. 497
         a) Results of Duguesne's Restructuring Proceedings ... 497
         b) Results of West Penn's Restructuring Proceeding ... 497
   G. Allegheny and DQE Record The Results Of The Restructuring Orders........ 500
   H. The Effect Of The Restructuring Orders ..................... 502
   I. Results Of The Merger Filing ............................... 503
   J. DQE Terminates The Merger Agreement ....................... 505
   K. Allegheny's Settlement With The PUC ....................... 510
   L. DQE's Asset Swap And Auction .............................. 511

II. Conclusions of Law............................................. 512
   A. Principles Of Contract Construction ....................... 512
   B. DQE's Termination Under Section 8.2(a)..................... 513
      1) Measurement Of A Material Adverse Effect (MAE) Arising From Application Of Restructuring Legislation ............. 513
      2) Definition Of "Materially Adverse Effect" ............. 517
      3) Application Of MAE Provision .......................... 518
      4) As Of October 5, 1998................................. 518
   C. Availability Of Section 8.2(a) To DQE...................... 520

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CINDRICH, District Judge.

This case involves DQE, Inc.'s termination on October 5, 1998 of a merger agreement with Allegheny Energy, Inc. That same day, Allegheny filed the instant complaint seeking specific performance of the merger agreement arguing that DQE had breached the agreement. Beginning on October 20, 1999, the parties presented extensive testimony and other evidence during a six day bench trial, after which the parties submitted proposed findings of fact and conclusions of law. The case has been extensively and expertly briefed and argued. Based on the evidence, arguments, and authorities presented, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

### I. *Findings of Fact*

#### A. *The Parties*

1. This case involves the October 5, 1998 decision of DQE, Inc. ("DQE") to terminate a merger agreement with Allegheny Energy, Inc. ("Allegheny") that was announced on April 7, 1997 and approved by both DQE's and Allegheny's shareholders on August 7, 1997.

2. Allegheny is a Maryland corporation and a registered public utility holding company under the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 *et seq.* ("PUHCA"). Allegheny derives substantially all of its income from the electric utility operations of its subsidiaries Monongahela Power Company, The Potomac Edison Company, and West Penn Power Company ("West Penn"), which are engaged principally in the generation, transmission, distribution and sale of electric energy in Pennsylvania, West Virginia, Maryland, Virginia, and Ohio. West Penn, the Pennsylvania subsidiary, constitutes approximately 45% of Allegheny's total assets and revenues.

3. DQE, a Pennsylvania corporation, is an energy services holding company that owns various regulated and unregulated subsidiaries. DQE's regulated electric utility subsidiary, Duquesne Light Company ("Duquesne"), provides electric service to customers in southwestern Pennsylvania, including, principally, the City of Pittsburgh. Duquesne constitutes approximately 90% of DQE's assets and revenues.

4. Both Allegheny and DQE are publicly held companies. The shares of both companies are registered pursuant to Section 12 of the Securities Exchange Act of 1934 and are listed and traded on the New York Stock Exchange. (Direct Testimony of Dr. Gregg A. Jarrell ("Jarrell Direct"), at 10 [1]; Exhs. D98, D101) [2].

#### B. *Jurisdiction and Venue*

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (c). (PTO ¶ 3).

#### C. *Deregulation of Electric Utilities in Pennsylvania*

6. Effective January 1, 1997, Pennsylvania adopted the Electricity Generation Customer Choice and Competition Act. 66 Pa. Cons.Stat. §§ 2801 *et seq.* (the "Restructuring Legislation"). To benefit retail electric customers, the Restructuring

---

1. In the interest of expediency and efficiency, the parties presented the direct testimony of each of each witness in a the form of a written submission which was verified by the witness on the stand. Counsel would then move for the admission of the testimony into evidence and tender the witness for cross-examination. Citation to such direct testimo-ny appears herein as ({*Witness Name*} Direct) at ¶ __).

2. Plaintiff's trial exhibits are cited within as either (Exh. P*x*) or (PX *x*). Defendant's trial exhibits are cited within as either (Exh. D*x*) or (DX *x*).

Legislation is designed to facilitate the deregulation of, and phase-in of competition in, the business of generating electricity in Pennsylvania. Transmission and distribution services, which are the other two legs of a vertically integrated utility, are not opened for competition—they are generally described as "natural monopolies"—but instead will continue to be regulated.

7. The Restructuring Legislation gives each customer the right, over a phase-in period beginning January 1, 1999, to purchase electricity from any qualified supplier. 66 Pa. Cons.Stat. §§ 2802, 2806. Formerly, each Pennsylvania retail customer could purchase electricity solely from the utility that had been granted an exclusive franchise over the customer's service territory. But with the passage of the Restructuring Legislation, customers are now permitted to choose their own suppliers, a development that represents a major change for electric utilities, which for the first time will be required to sell the electricity they generate in a competitive market, with no guaranteed customers or revenue base and no assurance that market prices will be sufficient to cover the cost of generating electricity or to produce a profit. (Direct Testimony of David D. Marshall ("Marshall Direct"), at 4).

8. Under the Restructuring Legislation, two-thirds of Pennsylvania retail electricity customers are currently eligible to choose their supplier of electricity, or "shop," with the remainder becoming eligible on January 1, 2000. Although shopping has been permitted only since January 1, 1999, by October 1, 1999 over 14 percent of Allegheny's and over 20 percent of DQE's customer load had switched to new suppliers. (Exh. D218).

9. The Restructuring Legislation requires customers to continue to pay to their franchised utility a delivery charge that reflects the cost of transmission and delivery of power over the utility's existing power lines, plus a separate charge reflecting the price that each customer agrees to pay to the electricity supplier of its choice. (PTO ¶ 12).

10. Prior to the implementation of the Restructuring Legislation, the Pennsylvania Public Utility Commission ("PUC") traditionally prescribed the rates that utilities such as West Penn and Duquesne may charge for *all* of their services—generation, transmission and distribution. In order to ensure that rates were both stable *and* as low as possible, the PUC required utilities to defer recovery of certain obligations and investments, including investments in generation assets, in return for the assurance—or the so-called "regulatory compact"—that they would have an opportunity to recover such costs under regulation in the future. (Morrell Direct at ¶ 6.)

11. Because of the requirements imposed by the pervasive regulatory system, expenditures and investments (including investments in generation facilities) that were made and approved under the regulatory regime may not be recoverable in a competitive market. To the extent that recovery of these investments will be impeded or prevented by the advent of competition, some or all of these costs would become "stranded." (Morrell Direct at ¶ 7.)

12. The Restructuring Legislation requires customers to pay to their franchised utility during the period from January 1, 1999 through December 31, 2005 (the "Transition Period"), unless extended by the PUC, a competitive transition charge ("CTC") that provides for the recovery of the utility's stranded costs.

13. More specifically, the Restructuring Legislation directed the PUC to determine the level of transition or stranded costs and required each utility in Pennsylvania to file a "restructuring" application with the PUC. Thereafter, the PUC would hold a public proceeding to establish each utility's stranded costs and issue a restructuring order awarding such costs. The amount of stranded costs awarded is to be collected by each utility through the CTC

which is paid by the utility's transmission and distribution customers during the Transition Period.

14. Thus, the CTC represents a stream of guaranteed future revenue that electric utilities are entitled to recover during the Transition Period regardless of whether future market prices of electricity go up or down (Marshall Direct, at 35). Accordingly, the restructuring proceedings were a matter of vital importance to electric utilities in Pennsylvania as the amount of CTC awarded by the PUC could substantially affect revenues and income during the Transition Period.

15. In sum, rates have changed under the Restructuring Legislation from a single "bundled" rate for combined services to "unbundled" rates consisting of three major components: (i) a charge for "generation services"—that is, electric power supply; (ii) a charge for "delivery services"—that is, transmission and distribution services; and (iii) the CTC.

16. However, the incumbent local utility is permitted to continue to charge the bundled rate to any customer that remains on its system. By comparison, customers who shop for electricity from alternative suppliers receive a credit—the "shopping credit"—equal to the generation component of their bundled rate, while paying the CTC and delivery charges to the incumbent local utility and a market rate for generation to a third party. Thus, only customers who shop receive a market price for generation. (Morrell Direct at ¶ 10.)

D. *Background of the Merger*

17. Beginning in October 1996, senior representatives of Allegheny and DQE began discussing the possibility of pursuing a merger. (Noia Direct at ¶ 25.)

18. At the time, the electric utility industry was undergoing a wave of consolidation as the industry was, throughout the

nation, moving away from traditional regulation towards a more competitive environment. (Marshall Direct, at 3; Direct Testimony of John W. Barr ("Barr Direct"), at 8 ).

19. In these early conversations, Allegheny's Chairman and Chief Executive Officer, Alan J. Noia ("Noia"), expressed to DQE's Chief Executive Officer, David D. Marshall ("Marshall"), how important the transaction was to Allegheny, in part because it would diversify Allegheny's business risk beyond the traditional regulated utility business to the unregulated businesses in which DQE clearly had experience and success. (*See Id.* at ¶ 26.) Mr. Noia told Mr. Marshall that he believed DQE's management skills in marketing and retail services would be critical in a competitive environment and particularly valuable when combined with Allegheny's historic strength in traditional electrical generation businesses. (*See id.*)

20. DQE believed that it would be too small to compete effectively on a stand-alone basis in the coming competitive environment in Pennsylvania. It was DQE's belief that the electric generation business would come to be dominated by a small number of very large, national and international players that would be able to reduce their risk and improve their margins by generating electricity through a system of plants located throughout the United States and diversified as to type of fuel and capacity. (Trial Tr., 10/26/99 (Marshall), at 125)[3]. DQE believed that a combination with Allegheny could provide it with greater opportunities to compete in a deregulated market, and that a combined DQE/Allegheny itself would be an attractive acquisition candidate as competition ushered in the wave of consolidation expected to occur among electric utilities here and abroad. (Marshall Direct, at 4–5).

---

**3.** Trial testimony is cited within as either ({*Date of Witness Testimony*} Trial Tr. at {*Page of Transcript*} ) or (Trial Tr. {*Date of*

*Witness Testimony*} ({*Name of Witness*} ) at {*Page of Transcript*} ).

21. Following passage of the Restructuring Legislation, Allegheny wished to remain in the generation business. In contrast, DQE had considered selling its plants, but had made no final decision to do so. (Marshall Direct, at 5, 17). Nevertheless, after it began merger discussions with Allegheny, DQE recognized that a combined DQE/Allegheny could be a stronger competitor in the generation business than DQE on a stand-alone basis. (Marshall Direct, at 17). DQE and Allegheny agreed that they would try to remain in the generation business in the event they merged, but only if they could do so on a rational financial basis that would not expose their shareholders to undue risk. (Marshall Direct, at 17–18).

22. Both DQE and Allegheny were well aware that their Pennsylvania subsidiaries shortly would be required to commence restructuring proceedings in Pennsylvania pursuant to the Restructuring Legislation. (Marshall Direct, at 18). Both companies recognized that there was a danger that one or both subsidiaries might not be permitted by the PUC to recover enough of their stranded costs to protect their shareholders from undue risk. DQE was fully prepared to exit the generation business if, as a result of the PUC's rulings in the restructuring proceedings, a sale of generation appeared necessary to protect the interests of its shareholders, and it made this clear to Allegheny. Accordingly, DQE made no commitment to Allegheny to remain in the generation business. (Marshall Direct, at 18; Trial Tr., 10/26/99 (Marshall), at 101–02).

23. During early discussions, DQE representatives did not express concern about the amount of stranded cost recovery that Allegheny would seek or need heading into deregulation (Noia Direct at ¶ 29.) Instead, DQE, which believed that it had more stranded costs than Allegheny, was more concerned with addressing whether Allegheny would oppose generation-related stranded cost recovery for high cost utilities such as DQE. (See id.) Mr. Noia explained that Allegheny had taken this position at the time that the competition legislation was being formulated but now that legislation had passed, Allegheny believed that each company—including West Penn—had to do its best to recoup its stranded costs. (See id.)

E. *The Merger Agreement*

24. On April 5, 1997, Allegheny and DQE entered into a written Agreement and Plan of Merger (the "Merger Agreement" or "Agreement") contemplating a tax-free, stock-for-stock merger transaction (the "Merger"), pursuant to which DQE would become a wholly-owned subsidiary of Allegheny. Under the terms of the Merger Agreement, each share of DQE common stock was to be exchanged for 1.12 shares of Allegheny common stock (the "Exchange Ratio"). (PTO ¶¶ 4–5). The Exchange Ratio represented a 22 percent premium for DQE's shareholders based on the closing prices of DQE's and Allegheny's stock on April 4, 1997, the last trading day prior to announcement of the Merger. (Marshall Direct, at 3). If the Merger was consummated, DQE's shareholders would have owned approximately 42 percent of the combined company. (PTO ¶ 5).

25. The Merger Agreement also provided that Allegheny would select nine of the fifteen directors for the merged company and that Mr. Noia would serve as Chairman and Chief Executive Officer, with Mr. Marshall slated to be President and Chief Operating Officer. (Noia Direct at ¶ 31.) Mr. Marshall conceded that these terms ensured that Allegheny would control the combined company. (Marshall Direct at 44.)

26. In negotiating the Merger, DQE and Allegheny exchanged five year projections (the "Budgets"). Section 5.1(f) of the Merger Agreement, titled "Absence of Certain Changes," expressly provides that each party's Budget was "provided to, and accepted by," the other party. (Exh. D1, at § 5.1(f)). Thus, the Budgets and the

expected financial performance of each company set forth therein formed an integral part of the parties' agreement to merge. In fact, in Section 5.1(f) of the Merger Agreement, DQE and Allegheny represented and warranted to each other that, among other things, except as expressly contemplated by their Budgets and certain other specified financial reports, each would suffer no "development" that would be "reasonably likely" to have a material adverse effect on its financial condition, properties, business or results of operations. (Exh. D1, at § 5.1(f)). In preparing their Budgets, both companies assumed that they would recover 100 percent of their stranded costs from the PUC in their subsidiaries' respective restructuring proceedings. (Exh. D102; Trial Tr., 10/26/99 (Marshall), at 205–06).

### 1) *Representations and Warranties*

27. Section 5.1 of the Merger Agreement sets forth the express contractual representations and warranties made by both Allegheny and DQE in connection with the contemplated Merger.

28. In Section 5.1(e) of the Merger Agreement, Allegheny and DQE represented and warranted to each other that from and after the "Audit Date" (December 31, 1996) their respective financial statements would fairly present their financial position and results of operations in accordance with generally accepted accounting principles ("GAAP"), and that their filings with the Securities and Exchange Commission (the "Reports"), including the financial statements set forth in the Reports, would contain no materially false or misleading statements of fact or omit to state any material facts necessary to make the reports not misleading. Section 5.1(e) provided in pertinent part that:

> ... [T]he Reports did not, and any Reports filed with the SEC subsequent to the date hereof will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading. Each of the consolidated balance sheets included in or incorporated by reference into the Reports (including the related notes and schedules) fairly presents, or will fairly present, the consolidated financial position of it and its Subsidiaries as of its date and each of the consolidated statements of income and of changes in financial position included in or incorporated by reference into the Reports (including any related notes and schedules) fairly presents, or will fairly present, the results of operations, retained earnings and changes in financial position, as the case may be, of it and its Subsidiaries for the periods set forth therein ... in each case in accordance with generally accepted accounting principles ("GAAP") consistently applied during the period involved, except as may be noted therein.

(Exh. D1, at § 5.1(e) (emphasis added)).

29. An objective of the parties in negotiating this Agreement, as expressed by Mr. Marshall in a March 25, 1999 letter to Mr. Noia, was that the contract make it "difficult to terminate [the Merger] since we both know the costs that termination would impose on each of our companies." (PX 35; *see also* 10/26/99 Trial Tr. at 129; Noia Direct ¶ 33.) As Mr. Noia phrased it, Allegheny's intention was "to maximize the chances of closing." (PX 29 at DQE 014215.)

30. Consistent with this objective, DQE sought in the Agreement to minimize a party's ability to use legislative or regulatory developments and, in particular, the new legislation in Pennsylvania deregulating aspects of the electric generation business, as grounds to terminate the merger agreement. Like many merger agreements, the DQE/Allegheny agreement contains a provision requiring, as a condition to closing, that the parties represent to one another that no development has occurred from a specified date prior to the

Merger Agreement being signed that is reasonably likely to have a material adverse effect ("MAE") on aspects of the company's business. This representation is embodied in Section 5.1(f) of the Merger Agreement and reads as follows:

> Except as disclosed in the Reports filed prior to the date hereof, or as expressly contemplated by this Agreement or as expressly contemplated by the DQE, Inc.1997 Five Year Plan, a copy of which has been provided to, and accepted by, [Allegheny] (the *"Company Budget"*) or the Allegheny Power Final Operating, Cash and Capital Budget for Year 1997 and Forecast Years 1998 through 2001, a copy of which has been provided to, and accepted by, [DQE] (the *"Parent Budget"* and collectively with the Company Budget, the *"Budgets"*), *since the Audit Date* it and its Subsidiaries have conducted their respective businesses only in, and have not engaged in any material transaction other than according to, the ordinary and usual course of such businesses and *there has not been (i) any change in the financial condition, properties, business or results of operations of it and its Subsidiaries or any development or combination of developments affecting it of which its management has knowledge that, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect on it.*

(Exh. D1, at § 5.1(f)(i) (emphasis added)).

31. MAE is defined in Section 5.1(a) of the Merger Agreement, which states in pertinent part as follows:

> *"Material Adverse Effect"* means with respect to any Person, a material adverse effect on the financial condition, properties, operations, business or results of operations of such Person and its Subsidiaries taken as a whole;

32. The definition of MAE in Section 5.1(a) of the Merger Agreement was the subject of negotiations between Mr. Noia and Mr. Marshall. Mr. Noia urged that the existence of an MAE resulting from any regulatory proceeding or ruling prior to closing of the Merger be determined by reference to the effect of the proceeding or ruling solely on the particular company affected. Allegheny took this position because it was concerned with DQE's ownership interest in certain nuclear facilities and wanted to be able to terminate the Merger Agreement in the event DQE suffered an adverse ruling with respect to those plants. (Trial Tr., 10/21/99 (Noia), at 48; Exh. D125, at 1–2).

33. In contrast, Mr. Marshall urged that an MAE be determined by reference to the effect of any development on the "combined" company. He believed that Allegheny's proposal, *i.e.*, "[l]ooking at impacts on one company" only, would make "it much easier to terminate the agreement." (Exh. D126, at 2).

34. In the drafting leading up to the Agreement, DQE suggested a proviso to this definition that would limit the extent to which a party could claim an MAE if the "effect" resulted from legislation or legislative activity. The proviso as initially proposed by DQE read as follows:

> *provided, however,* that any such effect resulting from any change in law, rule or regulation promulgated by (i) United States Congress, (ii) the Securities and Exchange Commission (the "SEC") with respect to the Public Utilities Holding Company Act (the "PUHCA"), (iii) the Pennsylvania State Legislature or the Pennsylvania Public Utilities Commission or (iv) the Federal Energy Regulatory Commission (the "FERC"). or any interpretation of any such law which affects both [DQE] and *its Subsidiaries* taken as a whole and [Allegheny] and its Subsidiaries taken as a whole shall only be considered when determining if a Material Adverse Effect has occurred to the extent that such effect on one such party exceeds the effect on the other party[.]

(PX 3 at AE 118829–30.)

35. Also, DQE initially suggested that the effect on it of any action taken by the

PUC be specifically excluded from the MAE definition:

> *provided further* that any such effect resulting from any action with respect to [DQE] taken by the Pennsylvania Public Utility Commission shall not be considered when determining whether a Material Adverse Effect has occurred.

36. DQE later amended this exclusionary language to specifically refer to the Restructuring Legislation:

> *provided, further,* that any such effect resulting from or caused by any Governmental Consents (as defined by Section 7.1(c)) or as a result of any restructuring plan of such person or any of its Subsidiaries pursuant to the Electricity Generation Customer Choice and Competition Act ... shall not be considered when determining if a Material Adverse Effect has occurred.

PX 4 at p. 10 (Rider 10.1); PX 5 at p.10 (Rider 10.1).)

37. The final definition of MAE as contained in the Merger Agreement reads as follows:

> *"Material Adverse Effect"* means with respect to any Person, a material adverse effect on the financial condition, properties, operations, business or results of operations of such Person and its Subsidiaries taken as a whole; *provided, however,* that *any such effect resulting from ... the application of the Pennsylvania Restructuring Legislation ... which affects both [DQE] and its Subsidiaries, taken as a whole, and [Allegheny] and its Subsidiaries, taken as a whole, shall only be considered when determining if a Material Adverse Effect has occurred to the extent that such effect on one such party exceeds such effect on the other party.*

(emphasis added).

### a) *Parties' Understanding of MAE Proviso*

38. DQE and Allegheny both testified at trial that prior to the execution of the Merger Agreement, both parties anticipated presenting its restructuring case before the PUC in the alternative—one case to be applied in the event that the Merger was consummated and one to be applied if the Merger was not consummated. (Noia Direct at ¶ 47; Morrell Direct at ¶ 33–36; Marshall Direct at 16.)

39. Mr. Noia and Michael Morrell ("Morrell"), Allegheny's Chief Financial Officer, testified that they understood that the proviso, where applicable, required that the MAE test would only be applied to the amount that represented the extent to which the effect was greater on one party than the other (*i.e.* the "differential effect"). (*See* PX 294 at AE 118504 ("Effects of Pa. restructuring legislation—take difference of effect on [companies] and apply it to MAE"); Noia Direct at ¶ 32; Morrell Direct at ¶ 69.)

40. Moreover, Mr. Morrell testified that in his "view [ ] a sophisticated merger partner like DQE would take into account what any particular [thing] that has occurred would have an affect on the future earning power of its merger partner.... You look at what happened to its value, what happened to its earning potential .... But those words in my view mean looking at the financial capabilities of the Company and how they have or have not been impacted since the day the representation was originally made." (10/20/99 Trial Tr. at 124–25.)

### 2) *Conditions to Consummation of the Merger*

41. Section 7.3 of the Merger Agreement set forth the conditions to the parties' obligation to consummate the Merger. One such condition, found in Section 7.3(a), required all of the representations and warranties made by Allegheny in the Merger Agreement, including the MAE Representation, to be:

> true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent any such

representation and warranty expressly speaks as of an earlier date), and [DQE] shall have received a certificate signed on behalf of [Allegheny] by an executive officer of [Allegheny] to such effect.

(Exh. D1, at § 7.3(a)).

### 3) *Right of Termination*

42. Article VIII of the Merger Agreement specified the circumstances in which one or both parties could terminate the contract prior to consummation of the Merger (the "Effective Time"). Subsection (a) of section 8.2 of the Merger Agreement provided in pertinent part that:

[The] Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time by action of the board of directors of either [Allegheny] or [DQE] if (a) the Merger shall not have been consummated by October 5, 1998 ... (the "Termination Date"); *provided* that the Termination Date shall automatically be extended for six months if, on October 5, 1998:(i) any of the conditions set forth in Section 7.1(c) [requiring receipt of required governmental approvals of the Merger] has not been satisfied or waived, (ii) each of the other conditions to consummation of the Merger set forth in Article VII [conditions to each party's obligation to effect the merger including representations and warranties] has been satisfied or waived or can readily be satisfied, and (iii) any Governmental Consent that has not yet been obtained is being pursued diligently and in good faith[.] ....

(Exh. D1, at § 8.2(a) (emphasis added)).

43. Thus, under Section 8.2(a), DQE was permitted to terminate the Agreement on October 5, 1998 if the Merger had not been consummated by that date, unless "on October 5, 1998," each of the conditions to the Merger (other than those relating to receipt of required governmental approvals) had been satisfied—including the condition in Section 7.3(a) that the MAE Representation in Section 5.1(f) be true and correct.

44. Section 8.2 further provided, however, that

the right to terminate this Agreement pursuant to clause (a) ... shall not be available to any party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the occurrence of the failure of the Merger to be consummated.

(Dx 1).

45. Section 6.5(c) of the Agreement required both parties "to cooperate with each other and use ... all commercially reasonable efforts ... to obtain as promptly as practicable all ... approvals" necessary to consummate the Merger. (Dx 1).

46. Section 8.3(b)(ii) of the Merger Agreement also permitted DQE to terminate the Merger Agreement at any time, either before or after October 5, 1998, in the event Allegheny committed, but failed to promptly cure, any material breach of the contract. Specifically, Section 8.3(b)(ii) states as follows:

[The] Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after the approval by stockholders of [DQE] ... by action of the board of directors of [DQE]:

\* \* \* \* \* \*

(b) if ... (ii) there has been a material breach by [Allegheny] of any representation, warranty, covenant or agreement contained in [the] Agreement that is not curable or, if curable, is not cured within 30 days after written notice of such breach is given by [DQE] to [Allegheny] ....

(Exh. D1, at § 8.3(b)(ii)).

### F. *The Restructuring Proceedings*

### 1) *Background*

47. The Restructuring Legislation defines stranded costs as "known and measurable net electric generation costs ...

which traditionally would be recoverable under a regulated environment but which may not be recoverable in a competitive electric generation market." One method for determining stranded costs for generation assets would be to sell those assets in an arm's length market transaction. Stranded costs could then be measured by the difference between the book value, representing the undepreciated historical cost of the plant, and the sale-determined market value of the plant.[4] An alternative to selling generation to determine stranded costs is an administrative determination of stranded costs, which relies on computer-generated market price and cost forecasts and application of discount rates that extend well into the future to establish stranded costs.

48. At the time they agreed to merge, both Allegheny and DQE recognized that the proposed Merger could take a year or more to close after the Merger Agreement was signed. (Marshall Direct, at 7–8). They also knew that there was a significant risk that the Merger might not be consummated at all, either due to a failure to obtain required regulatory approvals or because any regulatory approval might contain conditions that were unacceptable to the parties or that could not be satisfied. (Marshall Direct at 7–8).

49. Because both DQE and Allegheny understood there was no guarantee that the Merger would be consummated, they expected and agreed that each would be responsible for conducting its respective subsidiary's restructuring proceedings before the PUC in accordance with the best interests of its own shareholders. (Marshall Direct, at 8, 16–17).

50. Initially, however, both Allegheny and DQE agreed on a common strategy and approach. Both determined to ask the PUC to make a "market-based" determination of stranded costs, where actual market prices of electricity would be used to determine how much of West Penn's and Duquesne's costs were recoverable and how much were stranded. Allegheny and DQE agreed that such a determination would be superior to, and more likely to protect the interests of their shareholders than, the forecast approach, where the PUC would decide what future electricity prices were likely to be after considering testimony and forecasts offered by the utilities and the various intervenors in the restructuring proceedings. (Marshall Direct, at 8–9).

51. Consequently, both Allegheny and DQE proposed that the PUC employ a "multi-phase" approach, in which a CTC would be set initially by the PUC and then periodically adjusted in separate proceedings at intervals over the course of the Transition Period. (Marshall Direct, at 8). Although the initial CTC would be awarded based on expert forecasts of market prices, the CTC would be adjusted (or "trued up") at the end of the Transition Period to reflect actual market prices, with future credit to be given to, or additional charges imposed on, customers to accomplish the adjustment. (Marshall Direct, at 10).

52. The Pennsylvania Office of Consumer Advocate ("OCA") and various intervenors objected to these proposals, arguing that the only acceptable way to make a market-based determination of stranded costs would be to immediately auction the generation assets of each utility, which would establish the current fair market value of those assets. To the extent that the utility realized less than book value at the auction, the PUC would permit the utility to recover the difference through collection of a CTC from its customers. (Marshall Direct, at 10).

*2) The PECO Decision*

53. In December 1997, while the West Penn and Duquesne restructuring pro-

---

**4.** Although the Restructuring Legislation permitted the sale of generation assets to determine stranded costs, it expressly did not empower the PUC to order such a divestiture. *See* 66 Pa.C.S.A. § 2804(5).

ceedings were still pending, the PUC issued a final order in the restructuring case of Philadelphia Electric Company ("PECO"), the first utility in Pennsylvania to undergo restructuring. (Marshall Direct, at 11).

54. The PUC's order in the PECO restructuring case made clear that it intended to conduct a single, one-time determination of stranded costs for each Pennsylvania utility and, consequently, that the PUC would not agree to any form of phased, market-based determination as proposed by Duquesne and West Penn. (Marshall Direct, at 11).

55. Additionally, the PUC adopted the forecast of future market prices for electricity submitted by the OCA, which projected prices substantially above those forecast by West Penn and Duquesne. (Marshall Direct, at 11).

56. From the PUC's PECO decision, it became apparent that the OCA price forecast would also be applied by the PUC in any administrative determination of the stranded costs in the West Penn and Duquesne restructuring cases, and, in such event, would result in a significant disallowance of each utility's stranded cost request. (Marshall Direct, at 11).

57. The PUC's PECO decision was a watershed event, and one to which DQE and Allegheny reacted in very different ways.

58. DQE believed that in a competitive environment, the business of generating electricity would be a commodity business characterized by high volatility and low margins, and would through consolidation come to be dominated by a relatively small number of large national companies. (Marshall Direct, at 4–5). Given its perception of the coming competitive environment, DQE believed that full recovery of stranded costs in Duquesne's restructuring proceeding would be vital to its ability to compete, and that anything less than full recovery of its stranded costs would expose its shareholders to the risks of a highly volatile, low margin commodity business. (Marshall Direct, at 11–12).

59. The PECO decision demonstrated to DQE that, since the PUC would adopt the OCA's price projections, which were substantially higher than those of DQE and Allegheny, full recovery of Duquesne's stranded costs could not be obtained in an administrative determination of stranded costs, but could only be assured through the offer of an auction of its generation assets. (Marshall Direct, at 11).

60. Allegheny does not dispute that the generation business in a competitive environment will be more volatile and riskier and dominated by large national players. (Exhs. D 182, D183). Allegheny believes, however, that it is well-positioned to meet these challenges in light of its claimed expertise in the generation business. In addition, Allegheny emphasizes that it is a relatively low-cost generator of power given its lack of nuclear generation, its rural customer base and the location of its fossil fuel plants near sources of fuel. (Direct Testimony of Alan J. Noia ("Noia Direct"), at 12, 16, 27). Given these factors, Allegheny believes that it can—and would like to try to—survive in the coming competitive environment by retaining its generation assets and continuing to operate, as it has in the past, as an "independent" generator of electricity. (Noia Direct, at 24–29; Marshall Direct, at 25–26).

61. Allegheny has argued that its status as a low-cost generator with a low shopping credit under deregulation will deter most of West Penn's customers from shopping for alternative suppliers of power. Since customers who do not shop will continue to pay the old, pre-deregulation price for electricity, Allegheny believes that West Penn will be able to maintain its pre-competition revenue stream. (Direct Testimony of John G. Graham ("Graham Direct"), at 17–18). DQE presented evidence, however, showing that West Penn faces a substantial threat of competition. (Exhs. D204, D216, D217).

62. As previously noted, after just nine months of competition, and with only two-thirds of retail customers in Pennsylvania being allowed to shop, over 14 percent of West Penn's customer load had already "shopped away" from West Penn and was purchasing power from alternate suppliers as of October 1, 1999. (Exh. D218).

63. In light of the PECO decision, DQE determined that it could assure full recovery of its stranded costs only by offering in Duquesne's restructuring proceeding to auction all of Duquesne's generation assets for sale to the highest bidder. (Marshall Direct, at 11–12). Having decided to make that offer, DQE still needed to determine when and how to make it.

64. DQE concluded, after consulting with its advisers, that it could lose the opportunity to gain PUC approval of an auction plan if it attempted to submit an auction proposal after the close of the record in Duquesne's restructuring proceeding.

65. Indeed, the intervenors in Duquesne's restructuring proceeding had advocated the position that it would be unfair to Duquesne's ratepayers to permit an auction of Duquesne's generation assets, with a subsequent true-up of the stranded cost award, after an administrative determination had been made, since a low auction sale price might then mean that customers would pay a CTC higher than the charge imposed as a result of the PUC's earlier administrative determination of stranded costs.

66. However, in an effort not to undermine Allegheny's attempt to get the highest stranded cost award it could before deciding whether to retain its generation assets, DQE waited until Duquesne submitted its rejoinder testimony in its restructuring case (i.e., until just before the record closed) to propose a generation auction. In further deference to Allegheny, DQE made its auction proposal on conditional terms, offering to auction its generation assets only if the Merger with Allegheny were not consummated. (Marshall Direct, at 18–19).

### 3) *The January 12, 1998 Noia and Marshall Meeting*

67. On January 12, 1998, Messrs. Marshall and Noia met in advance of Mr. Marshall's testimony before the PUC in the proceedings on the parties' separate application for approval of the Merger. (Marshall Direct, at 19–20). Mr. Marshall was concerned that, given Duquesne's offer of a generation auction in its stand-alone case, he would be asked during his testimony whether Allegheny would agree to auction its assets as well. (Marshall Direct, at 20).

68. Mr. Marshall explained to Mr. Noia why DQE had determined to offer an auction in Duquesne's restructuring case, and why it believed that an auction provided the only means available to Allegheny for securing a market-based determination of stranded costs in West Penn's proceeding and protecting the interests of the combined company's shareholders. (Marshall Direct, at 20).

69. Mr. Noia viewed things differently. Mr. Noia testified that Mr. Marshall was, in his eyes, unduly panicked by the PECO case and that he believed that it was still the beginning of a long process that would present many opportunities either to obtain a solid restructuring order or to elect to sell generation. (Noia Direct at ¶ 50; 10/20/99 Trial Tr. at 143–44.)

70. Mr. Noia argued to Mr. Marshall that even if the PUC were to adopt the OCA price forecast in the West Penn proceeding as it had done in the PECO case, Allegheny would still be able to address that result by selling its generation assets later, if necessary. (Noia Direct at ¶ 51.)

71. Mr. Noia further contended that generation was intended to be a major component of the merged entity's future—and that Allegheny, unlike DQE, was extremely proficient at operating generation—and that it was too early in the

restructuring process to risk losing West Penn's low-cost assets in an auction. (*See id.*)

72. Mr. Noia also maintained that if West Penn indicated to the PUC any willingness to sell its generation assets, no other stranded cost solution would be possible because the intervenors and PUC, which obviously favored divestiture, would leap at the offer. (*See id.;* 10/20/99 Trial Tr. at 143–46.)

### 4) *Allegheny's Reaction to DQE's Urging to Sale*

73. Recognizing that Mr. Marshall had made a case for considering an offer to auction generation and that the results of the hearing might require it, Mr. Noia asked Mr. Morrell to prepare a memorandum to the Allegheny Board on the status of the Pennsylvania restructuring proceeding that raised the issue of whether an auction offer should be made. (*See* PX 40.)

74. Mr. Morrell's memorandum outlined potential near-term lost revenues if the assumptions in its case—which included 100% shopping—actually came about and West Penn was awarded no CTC and could not sell generation for two years to cover the loss because of pooling of interest accounting restrictions related to the Merger. (Morrell Direct at ¶¶ 43–44.) The memorandum forecast that a CTC recovery of between $200 and $800 million (the PUC final order would award West Penn $524 million in CTC recovery) would be sufficient to collect a CTC for two years and then "the Company could take some action at that time to try and mitigate the lost revenue including a divestiture of generation after the two-year prohibition on sales of assets (due to pooling of interest accounting) expires." (PX 40 at AE 109444.)

75. In preparation for a February 1998 Allegheny Board meeting, Mr. Morrell and others from Allegheny met with representatives of Goldman, Sachs & Co. ("Goldman Sachs") regarding generation asset valuation and divestiture. (*See* PX 304.) Goldman Sachs assured Allegheny that they believed that West Penn's generation would sell above book value. (Morrell Direct at ¶ 45.) They repeated that advice to the Allegheny Board on February 5, 1998, estimating that West Penn's assets would sell for between 1.25 to 2.2 times book value. (*See* PX 68.)

76. Prior to the February meeting, Mr. Morrell also received advice from Merrill Lynch on February 3, 1998 that they were comfortable that West Penn plants would get at least book value in a sale (for at least 2 years). (Morrell Direct at ¶ 45; PX 305 AE 123244–45.)

77. Neither firm predicted any imminent drop in market prices. (10/20/99 Trial Tr. at 85.) This was important because an issue existed as to whether a sale could be made within two years of consummation of the Merger, when the rules governing the ability to use pooling accounting, which the Merger Agreement contemplated, would restrict the combined companies' activities.

78. The Merrill Lynch and Goldman Sachs advice was conveyed to DQE shortly after it was received. (10/20/99 Trial Tr. at 86.)

79. At the February 5 meeting, Allegheny's Board concluded that it was premature to offer to sell generation assets to determine stranded costs. (*See* PX 287 at AE 121336–339; Noia Direct at ¶ 56.) As Mr. Morrell explained Allegheny's strategy, Allegheny "saw substantial value from our generation and wanted to keep that value for the benefit of our shareholders.... I remember explaining it that way to Mr. Marshall and financial analysts that it made perfectly good sense to go as long as you could and as far as you could to find out how much subsidy, so to speak, you could get, and then once you know the subsidy in the form of the CTC, add it on top of the value of the assets, basically what the output of them can be sold in the market and sale at market, then make a

determination." (10/20/99 Trial Tr. at 148–49.)

### 5) *West Penn's and Duquesne's Restructuring Cases*

80. West Penn and Duquesne were unique among the Pennsylvania utilities in that at the same time that they were proceeding through restructuring, their parents were in the process of seeking approval from the PUC for the Merger. As a result, West Penn and Duquesne each had to put forward what amounted to two distinct stranded cost cases: (i) a stand-alone case that assumed that the Merger did not occur, and (ii) a merger case to be applied if the Merger was consummated (the "Merger Restructuring Scenario"). (Morrell Direct at ¶ 33.)

81. In addition, because, unlike West Penn, Duquesne ultimately offered to sell generation, if possible, as a means to establish its stranded costs, the Duquesne case also contemplated in its stand-alone case both selling and not selling generation. (Morrell Direct at ¶¶ 29–36; PX 12 at DQE 028182, 028189.)

82. The PUC coordinated these approaches by making final stranded cost determinations for West Penn and Duquesne in the alternative: one to be applied if the Merger went forward and one to be applied if it did not. (*Id.*)

#### a) *Results of Duquesne's Restructuring Proceedings*

83. On March 25, 1998, the PUC administrative law judge ("ALJ") assigned to hear Duquesne's restructuring case recommended that the PUC accept Duquesne's offer of a generation auction to establish its stranded costs for its generation assets, and that Duquesne recover all of its other stranded costs, with the only exception of $142 million for mothballed plants and certain regulatory assets. (Marshall Direct, at 12).

84. On April 30, 1998, through a non-binding vote of its commissioners (a "polling decision"), the PUC voted to adopt the ALJ's recommendation and accept Duquesne's offer of an auction. (Marshall Direct, at 12).

85. On May 29, 1998, the PUC entered a final order confirming its polling decision and approving Duquesne's auction proposal. The PUC directed Duquesne to submit a detailed auction plan within 90 days, and ruled that if the auction did not generate proceeds equal to the book value of Duquesne's generation assets, the difference would be recovered through imposition of a CTC equal to the shortfall (with some minor exceptions relating to mothballed plants and regulatory assets). (Marshall Direct, at 12; Exh. D95 at 78–83).

86. The PUC's decision permitted Duquesne to fully recover all of its stranded costs, estimated at $1.9 billion, except for the $142 million in costs related to mothballed generating units and certain regulatory assets. (Marshall Direct, at 12–13; Exh. D95 at 78–83).

87. On April 30, the PUC also accepted "the rejoinder offer of Duquesne to divest itself of generation if the proposed DQE-[Allegheny] Merger is not consummated." The PUC also found that if DQE did not proceed with a divestiture, "the value of Duquesne's stranded utility generation shall be determined on the record of this proceeding," which the PUC termed the "merger scenario." (PX 12 at DQE 028182, 028189). In the Merger Restructuring Scenario, the PUC granted Duquesne an administrative determination of $1.332 billion (after tax) in stranded costs, which was a reduction from the $1.5 billion (after tax) that the ALJ had awarded.

#### b) *Results of West Penn's Restructuring Proceeding*

88. In West Penn's restructuring case, Allegheny claimed $1.6 billion in stranded costs. Because Allegheny had not offered an auction, on March 25, 1998, the ALJ assigned to the case adopted the OCA's price forecast, as expected, and recommended that the PUC allow West Penn to recover only $241 million—or just 15 per-

cent—of its requested stranded costs. (Marshall Direct, at 21). Although Allegheny was seeking in the restructuring proceeding to obtain the highest stranded cost recovery it could, so too were .all Pennsylvania utilities in their own restructuring proceedings, and Allegheny used the same assumptions and followed the same procedures as the other utilities in Pennsylvania. (Trial Tr., 10/20/99 (Noia), at 207–11).

89. The ALJ's recommended 15 percent recovery was by far the worst result in the proceedings of the major utilities in Pennsylvania. According to a presentation to the financial community prepared by Allegheny, the other utilities had received stranded cost awards ranging from 65 to 90 percent of their requests. (Exh. D171).

90. Allegheny's reaction to the ALJ's decision was immediate and vehement.

91. On March 26, 1998, Allegheny was publicly quoted as declaring that the ALJ's decision constituted "a threat ... to the future viability of the company." (Ken Zapinski, *Power Merger Delay Sought*, PITTSBURGH POST–GAZETTE Mar. 26, 1998).

92. On April 14, 1998, it stated in a brief filed with the PUC that the ALJ's recommendation, if adopted by the PUC, would have "devastating financial consequences." (Exh. D170, at 2) Allegheny further stated that it would need at least $1 billion in stranded cost recovery "for West Penn to maintain its financial integrity." (Exh. D170, at 5).

93. Allegheny prepared a presentation to the financial community in which it claimed that the ALJ's decision would cause West Penn to lose all of its earnings in 1999, 2000 and 2001, and to lose more than $600 million in earnings throughout the Transition Period. (Exh. D171).

94. Allegheny also arranged a meeting with the Governor of Pennsylvania in an effort to enlist his aid in lobbying the PUC to reject the ALJ's recommendation and permit Allegheny to recover substantially all of its $1.6 billion of stranded costs. In a set of "talking points" prepared for this meeting, Mr. Noia wrote that if the PUC adopted the ALJ's recommendation for stranded cost recovery for West Penn, the effect "would be to severely punish and financially cripple" Allegheny. (Exh. D17). Mr. Noia also planned to tell the Governor that, if the ALJ's decision was adopted, West Penn would have no ability to obtain bond financing for four years, that "Allegheny Energy's stock price would plummet," and that "[t]he lowest cost electric company in Pennsylvania will have been hurt the most." (Exh. D17; Trial Tr., 10/21/99 (Noia), at 14). Mr. Noia also intended to tell the Governor that West Penn would need to recover at least two-thirds of its claimed stranded costs, or approximately $1 billion, to retain its financial strength. (Exh. D17; Trial Tr., 10/21/99 (Noia), at 16).

95. Allegheny also arranged to transport Allegheny's employees to Harrisburg, where they held a rally on the steps of the Capitol to protest the results of the ALJ's recommendation and to urge the PUC to reject it. (Trial Tr., 10/21/99 (Noia), at 10).

96. On April 30, 1998, the PUC held its scheduled informal polling on West Penn's restructuring proceeding (the "Polling Decision"). The Polling Decision was an improvement to the ALJ's decision—it doubled the stranded cost recovery to approximately $525 million over a seven-year period in the Merger Restructuring Scenario, or approximately $595 million on a stand-alone basis. (*See* PX 24A.) (The difference in the Merger and standalone awards reflected the PUC's allocation to ratepayers of certain generation-related synergy savings in the event the Merger occurred.)

97. A major factor in the PUC's stranded cost award was its assessment of the market value of West Penn's plants: "Since all of West Penn's generating assets have a book value of $1.196 billion, West Penn's approach [seeking $1.084 bil-

lion in stranded utility generation] results in the conclusion that all of its generation assets are worth less than $100 million, or less than 10% of their book value. We agree ... that the proposal i[s] not credible." (PX 13 at DQE 008754.) The result echoed the arguments of Allegheny Teledyne. (*See* PX 387 at 3 ("[I]n the competitive market place, West Penn's generating assets will be worth far more than their book value, leaving West Penn with hundreds of millions of dollars of 'stranded benefits.' Therefore ... a reasonable result in this case is the denial of West Penn's stranded cost claim.").) The PUC instead concluded that the market value of West Penn's plants was $908.8 million.

98. Although this ruling represented an improvement over the ALJ's recommendation, Mr. Noia testified that Allegheny was still "greatly disappointed" by these results, which remained, in Allegheny's view, inadequate and financially harmful. (Trial Tr., 10/21/99 (Noia), at 3).

99. The PUC's disallowance of $1 billion of West Penn's stranded cost request still left Allegheny with recovery of just one-third of its claimed stranded costs, still by far the worst result, in percentage terms, of any utility in Pennsylvania. In fact, a chart prepared by Allegheny itself revealed that no other utility in Pennsylvania received less than 54 percent of its requested stranded costs, and that the average recovery of Pennsylvania utilities was 70 percent. (Exh. D178).

100. On April 30, 1998, Allegheny issued a press release in response to the PUC's polling decision in which it stated, without qualification, that the decision was "woefully inadequate, financially harmful to West Penn and unacceptable" and would cause the company to suffer "severe financial harm and competitively disadvantage the lowest cost producer of power in Pennsylvania." (Trial Tr., 10/20/99 (Morrell), at 96–97; Exh. D55).

101. On May 6, 1998, Mr. Noia wrote to Allegheny's employees explaining that "the PUC polling is inadequate and financially harmful to our company." He wrote that "[i]f the final order does not show an improvement, we will have no choice but to challenge it in the courts to make sure that our customers, shareholders and employees are not harmed." (Exh. D57, at 2).

102. On May 29, 1998, the PUC issued a final order identical in all material respects to the Polling Decision. (PTO ¶¶ 16–18; Exh. D93) As a result, Allegheny was denied recovery of approximately $1 billion, or two-thirds, of West Penn's stranded costs.

103. This disallowance represented the loss of a large guaranteed income stream that would have substantially cushioned what DQE reasonably viewed as the considerable risks inherent in engaging in the highly volatile, low margin commodity business of generating electricity in a deregulated market.

104. Following issuance of the PUC's final order, Allegheny had a second meeting, on or about June 10, 1998, with Governor Ridge in a further effort to enlist his aid to improve upon the effects of the PUC's decision. In notes prepared for this meeting, Mr. Noia set forth points that he wanted to make with the Governor, including Mr. Noia's view that the West Penn restructuring order was "financially harmful," that Allegheny was "facing a huge write-off" to reflect the effect of the order, and that Allegheny's "stock price [had] plummeted" in response to the order (D22A; Trial Tr., 10/21/99 (Noia), at 17–28), dropping 5.5 percent in the time period from the PUC's April 30, 1998 polling decision through June 9, 1998, just prior to Mr. Noia's scheduled second meeting with the Governor. (Trial Tr., 10/21/99 (Noia), at 25).

105. At trial, Allegheny offered the testimony of an economist, Dr. Bruce E. Stangle, who conducted an "event study" purporting to demonstrate just the opposite of what Mr. Noia planned to tell Governor Ridge—*i.e.*, that there was *no* negative reaction in Allegheny's stock price to

the PUC's ruling in West Penn's restructuring case. Dr. Stangle's event study was flawed in a number of respects, most significantly in his mechanistic use of three day "event windows" to study Allegheny's stock price reaction to various events, which had the effect of excluding significant declines in Allegheny's stock price that are not properly attributable to anything other than the PUC's ruling, and in his failure to consider that the Merger Agreement's fixed Exchange Ratio caused the prices of Allegheny and DQE common stock to move in tandem. Indeed, as demonstrated by DQE's expert economist, Dr. Gregg A. Jarrell, a properly conducted event study makes clear that Allegheny's stock price declined in a statistically significant amount following the PUC's issuance of the West Penn polling decision. (Jarrell Direct, at 50–52).

106. Allegheny has argued that the West Penn restructuring proceeding was no more than a typical "rate case," and constituted an extended "negotiation" with the PUC over stranded cost recovery. Although the restructuring proceeding may have had some characteristics of a rate case, its significance was far more profound that of an ordinary rate case, since it represented a one-time, non-recurring opportunity for a utility to secure a guaranteed revenue stream which would be collected during the course of the transition to full competition, regardless of the market price for electricity during that period.

107. While we recognize that the restructuring process involved some negotiations with political undertones, Allegheny's conduct and statements made in reaction to the PUC's rulings undermine its arguments in this case that it never really believed that the West Penn restructuring order had, or was reasonably likely to cause it severe financial harm.

108. Indeed, Peter J. Skrgic, the Allegheny officer responsible for the operation of the Allegheny's generating plants, prepared a memorandum during the restructuring proceedings outlining a presentation to be made to Allegheny's Board of Directors on the results in West Penn's case. (Exh. P289). In that memorandum, Mr. Skrgic declared that Allegheny needed to recover at least $800 million of its requested stranded costs in order to avoid the need to auction its generation assets. (Exh. P289). Allegheny's actual recovery ($524 million) fell far short of this amount. Although Allegheny's repeated public condemnations of the PUC's harmful ruling in West Penn's restructuring case could be viewed as mere posturing for purpose of "negotiating" with the PUC, Mr. Skrgic was not "negotiating" with Allegheny's Board of Directors. Rather, his presentation to the Allegheny Board was apparently an honest assessment of the level of stranded cost recovery genuinely required by Allegheny to survive in a deregulated environment.

109. When the PUC awarded Allegheny only one-third of its $1.6 billion in stranded costs, Allegheny understandably viewed the award as causing it severe financial harm, and it would have been reasonable for the investment community and DQE to have believed Allegheny when it described the effects of the PUC's rulings as such.

G. *Allegheny and DQE Record The Results Of The Restructuring Orders*

110. On June 12, 1998, Allegheny publicly filed a Form 8–K/A with the SEC, announcing that the PUC's restructuring order "disallow[ed] recovery of approximately $1 billion of West Penn's stranded cost claim," and that Allegheny expected to record a charge of between $400 and $500 million in the second quarter of 1998 to reflect the effects of the order. (Exh. D98).

111. On July 24, 1998, Allegheny issued a press release announcing that it had suffered a net loss of $211.6 million for the second quarter of 1998, and that "[i]ncluded in these results is an extraordinary

charge of $450.6 million ... [reflecting a] write off of [West Penn's] prudently incurred costs determined to be unrecoverable as a result of an Order by the Pennsylvania Public Utility Commission." (Exh. D157).

112. On July 28, 1998, Allegheny filed a Form 8–K with the SEC disclosing that as a result of the West Penn restructuring order, Allegheny would record a charge to earnings of $451 million ($265 million net of income taxes) in the second quarter ending on June 30, 1998. (Exhs. P183, P184).

113. On August 13, 1998, Allegheny filed its quarterly report for the second quarter of 1998 on its Form 10–Q filed with the SEC. (Exh. D103). The 10–Q reported a write-off of $450.6 million, which caused Allegheny to report a net loss for the quarter of $211.6 million. (Exh. D103).

114. The notes to Allegheny's second quarter 10–Q disclosed that the $450.6 million write-off was composed of:

| | |
|---|---|
| Loss contingency under NUG contract | $201.4 million |
| Asset impairment under capacity contract | 177.2 million |
| Write-off of cold reserved plant | 15.4 million |
| Other regulatory assets | 56.6 million |
| Total | $450.6 million |

(Exh. D103).

115. The $201.4 million portion of the write-off reflected Allegheny's adverse purchase commitments under the AES ("Beaver Valley") non-utility generation ("NUG") contract. These adverse purchase commitments reflect Allegheny's contractual obligation to purchase electricity for the next 20 years or more at a cost in excess of the estimated future market prices at which it expects to be able to resell the power to customers. The write-off reflects the expectation that future revenue collected from the sale of this purchased power will be less than the future costs incurred to purchase the power under the AES contract. The amount of the write-off reflects Allegheny's contingent loss, less the estimated recovery through the CTC from 1999 through 2005. (Direct

Testimony of Alan Jacobs ("Jacobs Direct"), at 24–25).

116. DQE's accounting expert, Alan Jacobs, a certified public accountant with extensive experience in the utility industry, explained how Allegheny was required to, and did calculate the amount of its write-off under GAAP, which the parties represented and warranted in the Merger Agreement would be applied in connection with the preparation of their respective financial statements. (Exh. D1, § 5.1(e)). Pursuant to Statement of Financial Accounting Standards ("SFAS") No. 5, Allegheny determined that the loss for adverse purchase commitments under its Beaver Valley NUG contract is "probable."

117. Mr. Jacobs testified that the term "probable" is assigned no special "accounting definition" under GAAP, but rather is accorded its plain and ordinary meaning, i.e., "more likely than not." (Trial Tr., 10/27/99 (Jacobs), at 113–14; see also Jacobs Direct, at 34). As Mr. Jacobs explained, the accounting rules require that if a company can determine the probable amount of a loss, it must record that amount as a write-off, but, if it can only determine a probable range of loss, its write-off must be recorded at the low end of the range. (Jacobs Direct, at 25). Allegheny's write-off represented the low end of the range of probable loss. (Jacobs Direct, at 25 & Tab 14).

118. Another portion of Allegheny's write-off related to certain of the company's generating assets. This portion was comprised of two components: (i) a $15.4 million write-off related to a cold reserved facility (i.e., an inactive plant) for which no revenue was provided for recovery, and (ii) a $177.2 million write-off as a result of the impairment of Allegheny Generating Company's Bath County plant. (The $177.2 million is the impairment amount after deduction of the partial recovery provided through CTC.) (Jacobs Direct, at 26). The latter write-off reflects Allegheny's best estimate, based on reasonable and supportable assumptions, of the extent to

which Allegheny will be unable to recover the carrying value of the Bath County plant as recorded on Allegheny's balance sheet. (Jacobs Direct, at 26–27; Trial Tr., 10/20/99 (Morrell), at 112–13).

119. As Mr. Jacobs further explained, under GAAP, Allegheny was required to, and did, perform an impairment analysis of its other plants which showed that the fair market value of those plants is more than $500 million below their book value. Although GAAP did not require a write-off of this variance between book value and fair market value, Mr. Jacobs explained that these generating plants are impaired from an economic perspective, because Allegheny expects to receive no return on its investment in them. (Jacobs Direct, at 28–30). Accordingly, Allegheny has hundreds of millions of dollars of unrecorded contingent losses as a result of the West Penn restructuring ruling. (Jacobs Direct, at 28–30)

120. Finally, a portion of Allegheny's write-off ($56.6 million) is the result of the elimination of regulatory assets for which recovery is no longer provided. Under SFAS No. 71, Accounting for the Effects of Certain Types of Regulation, a regulatory asset is created when (i) it is probable that future revenue in an amount at least equal to the capitalized cost (*i.e.*, the regulatory asset) will result from inclusion of that cost in allowable costs for rate-making purposes, and (ii) the future revenue will be provided to permit recovery of the previously incurred cost. As a result of the West Penn restructuring order, these two conditions were no longer met for certain of West Penn's regulatory assets. The regulatory asset values therefore were lost, and had to be written off by Allegheny. (Jacobs Direct, at 35).

121. Allegheny did not dispute Mr. Jacobs's description, explanation or characterization of any aspect of its write-off. The only permissible conclusion to be drawn from Mr. Jacobs's testimony is that, as a result of the PUC's ruling in West Penn's restructuring case, Allegheny pres-

ently expects to lose at least $450.6 million ($265.4 million after taxes), an amount equal to an entire year's worth of income for Allegheny.

122. DQE also took a write-off following entry of the PUC's final order in the Duquesne restructuring case. DQE wrote-off the full amount of the PUC's disallowance of its stranded costs, which totaled $142.3 million, or $82.5 million after tax. DQE thus has no unrecorded adverse effects of the PUC's restructuring order in Duquesne's restructuring case. (Jacobs Direct, at 18).

H. *The Effect Of The Restructuring Orders*

123. Both Allegheny and DQE were required to take significant write-offs as a result of the restructuring proceedings before the PUC. Yet, the Allegheny write-off, measured in absolute terms, is more than three times the size of the DQE write-off. Allegheny is a somewhat larger company than DQE; its total book value of common equity exceeded DQE's book value of common equity by 37 percent at year end 1998. Yet Allegheny's write-off was more than 220 percent larger than (that is, more than triple the size of) DQE's write-off. (Jacobs Direct, at 23).

124. In addition, Allegheny's 1998 write-off completely eliminated Allegheny's net income for the year and caused Allegheny to suffer a net loss. In percentage terms, its write-off amounted to 105 percent of the company's 1998 net income. This compares to 42 percent for DQE. Thus, as a percentage of 1998 net income, the Allegheny write-off is roughly two and one half times larger than the DQE write-off. (Jacobs Direct, at 23).

125. At the time of the negotiation and execution of the Merger Agreement, Allegheny and DQE exchanged Budgets containing five year business plans that included estimates of current year (1997) income and income projections for 1998–2001. The Budgets were expressly incor-

porated into Section 5.1(f) of the Merger Agreement. The Allegheny write-off amounts to 20 percent of its 1998–2001 aggregate projected net income. In contrast, the DQE write-off amounts to only 8 percent of its 1998–2001 aggregate projected net income. Allegheny's write-off is two and one half times DQE's write-off by this measure. (Jacobs Direct, at 23). Allegheny's write-off also equaled 13 percent of Allegheny's book value of common equity as of December 31, 1998. DQE's write-off was less than 6 percent of its book value of common equity as of December 31, 1998. (Jacobs Direct, at 23).

126. Apart from the write-off, Allegheny faces an unrecorded exposure to a loss of more than $500 million in light of Allegheny's own impairment analysis which shows that all of its generating plans (apart from Bath County) have projected fair market values below the book values recorded on the balance sheet. In contrast, because the Duquesne restructuring order provides for recovery of stranded costs not recovered through the auction of its generating plants, DQE faces no ongoing unrecorded adverse effects from the Duquesne order. (Jacobs Direct, at 18, 29).

127. There also is a significant disparity between the stranded cost recoveries of Allegheny and DQE, respectively. As noted above, the PUC disallowed recovery of approximately $1 billion of Allegheny's stranded costs. In contrast, DQE has been permitted to recover all but $142 million of its stranded costs. As a result of the $1 billion disallowance, Allegheny was denied the opportunity to receive a large stream of guaranteed future revenues that it had been receiving prior to deregulation and that it would have been entitled to recover—regardless of whether future market prices for electricity go up or down—had its stranded cost request been granted by the PUC.

128. Allegheny's decision to remain in the generation business and the consequent loss of a guaranteed revenue stream in the amount of $1 billion substantially increased Allegheny's exposure to the risk of fluctuations of the market price of electricity. Although Allegheny may still at the moment be a financially sound company, it faces significant future risks in the low-margin commodity business of electricity generation. (Exh. D90). In contrast, DQE faces no such risk, because it has elected to auction its generation assets and has received from the PUC the concomitant right to recover virtually all of its stranded costs.

## I. *Results Of The Merger Filing*

129. On August 1, 1997, the same day they filed their restructuring cases, DQE and Allegheny also filed joint applications for approval of their Merger with the PUC and the Federal Energy Regulatory Commission ("FERC"). (Exhs. D96, D166).

130. All applicants for approval of a utility merger must show that the merger will not substantially increase market concentration or otherwise permit the exercise of excessive market power. Allegheny and DQE submitted testimony in the PUC proceeding showing that they could not meet this standard given the current structure of the market. The companies therefore proposed certain "mitigation" measures that would lower the level of market concentration in the area, including joining an independent system operator ("ISO"), a nonprofit entity established to operate a regional transmission grid in a manner that does not unduly favor any one market participant. Allegheny and DQE also proposed relinquishing control of a certain amount of generating capacity as a further mitigation measure. (Exh. D96).

131. The ALJ issued a decision on the merger application on March 25, 1998, finding that the merger should be delayed for 18 months pending resolution of certain market power issues. (*See* PX 10 at 188.)

132. On April 30, 1999, the PUC issued a draft order on the Merger (later finalized on May 29, 1998) which rejected the ALJ's

recommendation that the merger be delayed for 18 months. The PUC further held that the companies' mitigation proposals were inadequate. Thus, the PUC imposed the requirement that Allegheny and DQE join—prior to consummation of the merger—a "fully functioning" ISO. (PX 14 at AE 023410–023411.)

133. In response to this order, both parties publicly acknowledged that the conditions imposed by PUC threatened to prevent consummation of the Merger. In nearly identical Form 8–Ks filed on June 12, 1998 with the Securities and Exchange Commission (the "SEC"), Allegheny and DQE stated that they:

> *[do] not expect that these [market power] conditions can be satisfied within the time periods specified in the Merger Agreement.* The Merger Agreement provides that either party may terminate the Agreement on October 5, 1998 if closing has not occurred by that date or, under certain limited circumstances relating to the non-receipt of regulatory approvals, closing has not occurred by April 5, 1999. The Midwest ISO is not expected to be fully operational until June 30, 2000.

(Exhs. P181; P185 (emphasis added)).

134. At trial, Mr. Noia acknowledged that the Midwest ISO is presently not expected to be fully functioning until sometime in 2001, at the earliest. (Trial Tr., 10/21/99 (Noia), at 75; Marshall Direct, at 15, 47). The only ISO that was and is fully functioning, the PJM ISO, has certain membership requirements that DQE and Allegheny agreed were unacceptable. In any event, the PJM ISO would not have mitigated market power and thus could not be viewed as a viable alternative that would enable the parties to satisfy the conditions that the PUC placed on approval of the Merger. (Marshall Direct, at 46–47). Thus, the market power mitigation conditions imposed by the PUC seriously threatened consummation of the Merger, and continue to do so. (Trial Tr., 10/21/99 (Noia), at 6, 13; Exhs. D17, D22A, D57).

135. Recognizing that the Merger would likely fail unless reasonable alternative mitigation measures were proposed, Allegheny and DQE commenced discussions regarding an appropriate course of action. Allegheny determined to propose to the PUC and to the FERC (which also has jurisdiction respecting market power issues) an "interim" market power mitigation measure pursuant to which the Merger would be allowed to close if the companies sold 570 MW of output from DQE's Cheswick electric generating plant into the market. (Exh. D27, at 10).

136. On July 23, 1998, the PUC issued an order on reconsideration addressing market power issues. It accepted the commitment regarding the sale of Cheswick capacity, but nonetheless found it insufficient to ameliorate its market power concerns. The PUC ordered that unless the merged company could establish at a market power hearing to be held January 1, 2000 that market power had been mitigated by that date, and unless the merged company joined a fully functioning ISO meeting the PUC's seven criteria by June 30, 2000, the PUC would order the merged company to divest 2500 MW of generation—an amount that was approximately equal to DQE's total generation capacity. (Exh. D39, at 10).

137. Allegheny accepted this condition, but DQE did not, given that it was the same condition both companies had previously rejected as imposing "undefined" obligations and as "totally unsupported by any analysis in the record." (Exh. D165, at 22).

138. On September 16, 1998, the FERC issued an order rejecting the proposed sale of Cheswick capacity, finding that "Applicants themselves acknowledge that all the output of the Cheswick Generating Station may not be sold under their short-term sales proposal." (Exh. D166, at 13). The FERC therefore required Allegheny and DQE either to (i) *divest* the Cheswick plant *prior* to consummation of

the Merger, because there otherwise "would be no effective interim mitigation measures in place prior to such time," or (ii) submit to a hearing on market power mitigation. (Exh. D166, at 18; *see also* Marshall Direct, at 45).

139. Following issuance of the FERC order, DQE stated publicly that

[g]iven the complexity of divesting a plant such as Cheswick, including the appropriate resolution of operational and labor issues, the process for auctioning the plant and negotiation of the associated contractual arrangements and the lead time for the associated regulatory approvals, it is, in DQE's view, a practical impossibility that such a plant sale would close prior to April 5, 1999, the date on which either party can terminate the merger agreement for any reason.

(Exh. D167; *see also* Marshall Direct, at 45).

140. Allegheny has never disputed DQE's assertion that Cheswick could not be divested by April 5, 1999. Instead, in response to the FERC's divestiture order, Allegheny unilaterally filed a proposal with the FERC pursuant to which the Cheswick plant would be transferred, prior to consummation of the Merger, to a trustee who would operate and maintain the plant and subsequently auction it. (Exh. 168). Allegheny submitted this proposal without prior notice to or consultation with DQE. (Exh. D27, at 11).

141. DQE responded that, because of the complexity of the trust proposal and the required regulatory approvals, that proposal too could not be consummated by April 5, 1999, even if it were deemed to comply with the FERC order requiring divestiture. (Exh. D169).

142. As of October 5, 1998, the FERC had not accepted Allegheny's trust proposal.

J. *DQE Terminates The Merger Agreement*

143. After the PUC issued its decision in the PECO restructuring case, DQE re-peatedly expressed to Allegheny its position that the only means by which West Penn could assure full recovery of its stranded costs, and thus protect the shareholders of the combined company, was through the offer of an auction of its generation assets. Allegheny's management, however, continually deferred making any commitment to submit such an offer to the PUC, stating instead that it wished to "play out the string" in an effort to remedy its deficient stranded cost award without a generation auction. Allegheny's conduct made DQE's management increasingly uncomfortable due to its belief that the opportunity to offer a generation auction would be lost once West Penn's restructuring proceeding was concluded. (Marshall Direct, at 19–22).

144. On May 8, 1998, Allegheny's Board of Directors met and reviewed the West Penn Polling Decision and reconsidered auctioning generation to determine stranded costs. An auction was rejected by the Board as being premature. (*See* PX 279 at AE 120675.)

145. In a May 12, 1998 conversation, Mr. Noia informed Mr. Marshall that Allegheny's Board of Directors had determined not to offer a generation auction in West Penn's restructuring proceeding. (Marshall Direct, at 25). This announcement "stunned" DQE, and was a matter of grave concern to its management. (Marshall Direct, at 25).

146. Mr. Noia telephoned Mr. Marshall on May 12, 1998 to discuss a possible settlement of litigation brought by an intervenor who opposed the Merger. (Noia Direct at ¶ 66.) During this conversation, Mr. Marshall again urged Mr. Noia to auction West Penn's generation. (*See Id.*) Mr. Noia informed Mr. Marshall that Allegheny's Board of Directors had determined not to offer a generation auction in West Penn's restructuring proceeding. (Marshall Direct, at 25). This announcement was a matter of grave concern to

DQE's management. (Marshall Direct, at 25).

147. In a May 19, 1998 letter to Mr. Noia, Mr. Marshall stated that Allegheny "must agree to offer an auction [of the generation assets] ... for this merger to proceed. If it does not, I will recommend to the DQE Board of Directors that it is in the best interests of Allegheny and Duquesne to agree to terminate the [Merger Agreement] by mutual consent. That failing, I will recommend to the DQE Board of Directors that DQE terminate the [Merger Agreement]." (PX 49 at AE 120656.)

148. In a May 22, 1998 letter responding to Mr. Marshall's letter of May 19, Mr. Noia restated Allegheny's position:

> One of the strategic rationales for our merger, which has been reiterated in our proxy statements and other public communications, is that together our companies will have sufficient generating resources to be a player in the competitive generation market. That rationale has not changed, and after a thorough consideration of the arguments in favor of and against divestiture, the Allegheny Board of Directors has decided at this time that it is in the best interests of Allegheny to maintain the flexibility to retain its generation assets. It is premature to decide whether to voluntarily sell these assets. If Allegheny retains its generation it will always be free, subject to pooling of interests accounting limitations, to sell it in the future. We believe that if we choose to sell generation assets, then West Penn could seek at that time to recover incremental stranded costs, if any, through an adjustment to its CTC or otherwise.

(PX 51 at AE 085209.)

149. Mr. Noia's contention that Allegheny was still free to sell its "generation in the future" encompassed two alternatives. The first was offering a generation auction *as part of* a settlement of the restructuring process. On April 30, 1998

PECO and the PUC reached a settlement in the PECO restructuring case after PECO had filed litigation challenging its order. The settlement modified and improved PECO's restructuring outcome. In light of PECO's settlement, Allegheny believed that it would have another opportunity to make such an offer to sell its generation.

150. Allegheny's supposed second alternative was to settle the restructuring process with the highest CTC attainable, auction generation at some point in the future if necessary, and, at that time, ask the PUC to modify its stranded costs determination if the auction resulted in a below book value sale.

151. DQE understandably expressed skepticism about these alternatives as Allegheny had no ruling from the PUC that either alternative would be allowed and most if not all of the intervenors had already argued against such alternatives.

152. Mr. Morrell testified that in response to DQE's skepticism, he had conversations in early June with staff members of the PUC and one PUC Commissioner, all of whom assured him that a stranded cost adjustment—the True–Up Right—would be permitted if Allegheny changed its mind and decided, after a final order was issued, to sell West Penn's generation and such a sale was below book value minus the current level of stranded cost recovery. (Morrell Direct at ¶ 60.)

153. The substance of these conversations was reported by Mr. Morrell to Larry Crayne of the DQE legal department on June 12, 1998. (*See* PX 298 at AE 123268–69; 10/26/99 Trial Tr. at 160; 10/27/99 Trial Tr. at 66, 83; Clayton Dep. at 121; Marshall Dep. at 80–83; O'Brien Dep. at 227–28.)

154. Allegheny continued in its efforts to convince DQE of its wait-and-see approach. On June 11, 1998, Mr. Noia sent Marshall and two DQE directors a memo-

randum informing them that Allegheny had "obtained advice from [Merrill Lynch and Goldman Sachs] that Allegheny Energy's generation units would likely sell for a price in excess of book value." (PX 66 at DQE 013445.) Mr. Noia also told them that Mike Morrell had checked with Goldman Sachs who assured him that the market was not near collapse. (*See id.; see also* PX 68.)

155. Allegheny also continued in its efforts to obtain PUC approval of its "wait and auction later" alternative. On June 12, 1998, Allegheny filed a motion for reconsideration of the PUC's ruling West Penn's restructuring case. Allegheny requested that "the Commission confirm that West Penn and Duquesne each retain the right, at their option, to use the auction procedure approved by the Commission in the Duquesne restructuring proceeding as a means to value their assets for stranded cost purposes." (PX 15 at AE 019008.) Allegheny further proposed that the companies be permitted "to inform the Commission of their decision (whether to sell generation) after the Commission's orders in each individual restructuring docket are finalized on appeal, or otherwise become non-appealable. West Penn and Duquesne would file an auction plan with the Commission within 30 days thereafter." (*Id.* at AE 019009.)

156. The PUC responded in a July 23, 1998 order that "[a]s to the Applicants' other request to affirm the merged company's *right to auction generation,* at its option, *for stranded cost valuation purposes,* the proposal, as presently submitted, is too vague to permit a reasoned determination that it should be granted at this time. We realize, however that the Applicants are free at any time to present a specific [generation auction] proposal to th[e] Commission for consideration." (PX 18 at AE 023831 (emphasis added).)

157. Mr. Noia testified that while not as clear as he would have liked, he interpreted the order as not being "inconsistent with our understanding that a stranded cost readjustment would be permitted even if we sold our generation assets after the restructuring proceeding had concluded. Indeed, had the PUC been opposed to that notion, it could have just outright rejected it in the order." (Noia Direct at ¶ 76.)

158. West Penn appealed the PUC's order to the Commonwealth Court of Pennsylvania, however, on July 26, 1998. West Penn also filed a federal complaint against the PUC in this court, claiming that the PUC's decision represented an unconstitutional taking of its property and assets, and sought an injunctive, declaratory and monetary relief from the final order of the PUC.

159. Mr. Noia relayed his interpretation of the order in a July 27, 1998 letter to Mr. Marshall: "With respect to a generation auction for stranded cost valuation, the Commission left the door wide open for us to present a proposal. We believe that this provides all the flexibility we need." (PX 97 at AE 085341.) Mr. Noia also reiterated Allegheny's belief that West Penn's regulatory outcome would be improved as a result of a settlement with the PUC, as had occurred with PECO. (*See id.*) Mr. Marshall again never responded to these assurances.

160. DQE's view of the order, however, was that Allegheny's motion had been denied in all material respects.

161. On July 28, 1998, DQE's Board of Directors met to consider the effects of the West Penn restructuring order on Allegheny. The directors reviewed events that had transpired since the Merger Agreement was signed, including the restructuring proceedings. DQE's Board considered, among other things, (i) the increased risk to which its shareholders would be exposed in the event of a merger given Allegheny's apparent decision to remain in the generation business in the face of its loss of $1 billion in stranded cost recovery; and (ii) the significant decline in the value of the Merger consideration to be paid

under the Merger Agreement to DQE's stockholders, based on the stock prices of DQE and Allegheny at that time.

162. With respect to the latter factor, on July 27, 1998, the day before the DQE Board meeting, Allegheny's stock closed on the New York Stock Exchange at the per share price of $28.3125, more than $1.00 *below* its closing price on the day before the parties announced the Merger more than a year earlier. On July, 27, 1998, at the then prevailing market price of $28.3125 per Allegheny share, the value of the merger consideration (1.12 shares of Allegheny common stock) to a DQE shareholder was $31.71, or $3.727 *below* the $35.4375 closing price of DQE's common stock on the New York Stock Exchange on that same date. Thus, the value of the merger consideration on July 27, 1998 represented a 10.5 percent *discount* to the then current value of DQE's shares, as contrasted to a 22 percent *premium* when the Merger was announced. As a group, DQE's shareholders would have suffered a loss of more than $296 million had the Merger closed on that date. (Marshall Direct, at 26–30).

163. By Friday October 2, 1998, the last trading day before October 5, 1998, when the Merger was terminated, the decline in value was even greater. Allegheny shares closed on October 2 at $31.3125, making the merger consideration worth $35.07. DQE's shares closed that day at $40.9375, $5.8675 (or nearly 17 percent) above the merger consideration. At those prices, DQE shareholders would have lost more than $465 million had the Merger been consummated. (Marshall Direct, at 30 n.2).

164. At the July 28, 1998 Board meeting, DQE's directors received presentations from DQE's management and the company's independent financial adviser, Credit Suisse First Boston ("CSFB"). CSFB compared the projected earnings impact of the Duquesne and West Penn restructuring orders against certain defined benchmarks for DQE and Allegheny, including market value and book value (net worth), which, in each instance, revealed that the expected negative effects of the West Penn restructuring order on Allegheny greatly exceeded the effects of the Duquesne order on DQE. (Exh. D158).

165. CSFB also analyzed both the write-offs recorded by DQE (*i.e.,* $142 million) and Allegheny (*i.e.,* $450.6 million) as a result of the restructuring orders and the stranded cost disallowances of DQE (*i.e.,* $142 million) and Allegheny (*i.e.,* $1 billion) against the same benchmarks, which again demonstrated that Allegheny had suffered greater harm than DQE as a result of the PUC restructuring proceedings. (Exh. D158).

166. CSFB also presented the estimated earnings impact of the PUC's orders on DQE and Allegheny using the agreed upon Budgets incorporated in the Merger Agreement. For 1998, during which both DQE and Allegheny recorded their write-offs as a result of the restructuring orders, DQE's earnings were expected to be reduced by 42.4 percent and Allegheny's by 90 percent. Going forward, DQE's earnings were expected to be reduced by no more than 3.3 percent in any year between 1999 and 2002, with a total cumulative reduction to earnings from 1998 to 2002 of 9.1 percent. In contrast, Allegheny's earnings were expected to be reduced by amounts ranging from 23.7 percent to 38.3 percent from 1999 to 2002, with a total cumulative reduction to earnings from 1998 to 2002 of 43.3 percent. (Exh. D158).

167. CSFB also quoted some of the strident and alarming public statements made by Allegheny in response to the West Penn restructuring order, which provided further confirmation of the material adverse effect of the order. For example, CSFB quoted Allegheny's statement that the PUC's projections showed "an approximate $1 billion loss to West Penn" that the PUC "largely offsets on the basis of speculative and counterintuitive projections."

(Exh. D158). Allegheny was also quoted as declaring that:

the [PUC's] decision knowingly results in West Penn having a significant loss of earnings throughout the entire transition period—a loss which necessarily produces a return on investment far below any conceivable zone of reasonableness.

(Exh. D158).

168. Finally, CSFB's presentation also included the reactions of securities analysts to the West Penn restructuring proceedings. For example, it cited a report from HSBC Securities that termed the West Penn restructuring order "a financially punitive plan for Allegheny," and predicted that the effect of the PUC's order would be to reduce the combined company's 1999 earnings by ten percent from $2.71 per share to $2.43. (Exh. D158). The presentation also quoted a CIBC Oppenheimer analyst's report that estimated the West Penn restructuring order would cost Allegheny over $90 million, or $0.45 per share, during 1999 and 2000. (Exh. D158).

169. DQE's Board concluded that the PUC's restructuring order would "result in a failure of the conditions to DQE's obligation under the [Merger Agreement] and constitute a material adverse effect under the Agreement." (Exh. D106). The Board determined that it could not, consistent with its fiduciary duties to DQE's shareholders, authorize DQE to consummate the Merger. (Exh. P285).

170. DQE's Board therefore instructed Mr. Marshall to write to Mr. Noia to express DQE's position and to invite Allegheny to agree to a mutual termination of the Merger. Mr. Marshall was directed to tell Mr. Noia that if Allegheny was unwilling to agree to termination, DQE would exercise its right to terminate the Merger Agreement no later than October 5, 1998 unless the adverse effects of the PUC's restructuring order on Allegheny had been cured by that date. (Marshall Direct, at 30–31).

171. By letter dated July 28, 1998, DQE formally advised Allegheny that the PUC's Restructuring Order constituted an MAE and that unless Allegheny cured this problem by the October 5, 1998 termination date, DQE would terminate the contract. (Exh. D106). DQE advised Allegheny that it had reached this determination because the members of its Board of Directors had concluded that they could not, consistent with their fiduciary duties, commit DQE's thousands of public shareholders—who would own 42 percent of the combined company if the Merger was consummated—to a transaction in which they would effectively be forced to absorb 42 percent of the material loss resulting from the PUC's order in West Penn's restructuring case. (Exh. D106; PTO ¶ 5).

172. DQE sent a copy of the July 28, 1998 letter to the FERC, the SEC, and the Antitrust Division of the Department of Justice (the "DOJ")—all the regulators that had not yet ruled on the Merger. The July 28 letter was accompanied by a cover letter stating that DQE did not intend to consummate the Merger under current circumstances and that it would promptly notify them if circumstances changed.

173. As for the FERC, following receipt of the July 28 letters, it sent a letter to both Allegheny and DQE on August 5, 1998 asking that the parties "indicate to the Commission whether the proposed merger will, or can, be consummated and whether any further action should therefore be taken by the Commission in this case." (PX 108 at AE 092011.) DQE responded that in light of the July 28 Letter, DQE "cannot represent that the merger 'will be consummated'" and stated that "it is not reasonable to request a regulatory body to expend its scarce resources to review a commercial transaction when there is a substantial possibility that the transaction will not be consummated." (PX 113 at AE 091966.) DQE further stated, however, that "DQE recognizes

that Allegheny does not share our view and is insisting that the Commission act immediately on the pending merger application, despite the substantial possibility that the merger may not be consummated. To the extent that the Commission determines, in its discretion, that such action is appropriate, DQE does not object to the issuance of an order on the merger application." (PX 113.)

174. Allegheny stated in its response, however, that the "merger with DQE can be consummated" and requested that the Commission "act promptly on the merger application." (PX 115.)

175. The FERC ultimately approved the Merger on September 16 but DQE issued a press release the next day rejecting the FERC's approval. (*See* Morrell Direct at ¶ 107.)

176. The DOJ staff informed Allegheny that it would not conclude consent decree negotiations unless and until DQE resumed its participation. (*See* Morrell Direct at ¶ 113; PX 105; PX 109.)

177. In late September, 1998, DQE's Board met again to consider the effects of the West Penn restructuring ruling on Allegheny. (Marshall Direct, at 33). Following a review of the situation with its legal advisors, DQE's directors again concluded that the ruling caused Allegheny to suffer an MAE, and that the Board's obligations to DQE's shareholders required termination of the Merger Agreement. (Marshall Direct, at 32–33).

178. At the September meeting, DQE's Board considered both the significant probable losses to be suffered by Allegheny (by its own estimation) as a result of the West Penn restructuring ruling (as reflected by Allegheny's $450.6 million second quarter write-off) and the risk posed to Allegheny by the PUC's denial of $1 billion of West Penn's stranded cost request, which deprived Allegheny of a guaranteed revenue stream as it entered the competitive market. (Marshall Direct, at 34–35).

179. Although Allegheny could have avoided this risk by offering to auction West Penn's generation assets, DQE's Board had determined that Allegheny intended to retain its generation assets in an attempt to compete in a competitive market. Allegheny had consistently failed to advise DQE whether and under what circumstances it might consider selling those assets, and therefore it is both reasonable and understandable that DQE's Board concluded that Allegheny would never agree to sell its generation assets under any circumstances. (Marshall Direct, at 25–26).

180. When Allegheny failed to obtain any improvement in the terms of the PUC's restructuring order by October 5, 1998, DQE formally notified Allegheny in writing on October 5, 1998 that, effective immediately, the Merger Agreement was terminated pursuant to (1) Section 8.2(a)(ii), because the Merger had not been consummated by October 5, 1998 and the conditions for extending the October 5 termination date had not been met, and (2) Section 8.3(b)(ii), because Allegheny was not in compliance with, and had not cured its default respecting, its MAE Representation in Section 5.1(f)(i) of the contract. (Exh. D27).

### K. *Allegheny's Settlement With The PUC*

181. At no time prior to or after July 28, 1998 and at no time prior to October 5, 1998, did Allegheny provide DQE with any specific information regarding how it would attempt to remedy the adverse effects of the PUC's order, nor did it ever provide DQE with any specific plan for how or under what circumstances it would auction its generation assets. (Marshall Direct, at 31; Exh. D179).

182. In the summer of 1998, after it sued the PUC in state and federal court, Allegheny commenced settlement discussions with the PUC in an attempt to negotiate an improved restructuring order for

West Penn. Those talks were acrimonious and proved to be short-lived, as they were abruptly terminated by the PUC on August 25, 1998. DQE had made a formal request to participate in these settlement talks, but this request was denied by the PUC after Allegheny strenuously objected to it. (Marshall Direct, at 32).

183. Allegheny never informed DQE of the status of its settlement discussions with the PUC, the respective positions of the parties, or what Allegheny believed would be the terms of an acceptable settlement. (Trial Tr., 10/20/99 (Morrell), at 186–87; 10/21/99 (Noia), at 63).

184. Allegheny's settlement discussions with the PUC did not resume until after October 5, 1998. On Friday, October 2, 1998, Allegheny wrote to Chairman Quain of the PUC and stated that "West Penn believes it is now appropriate to make another attempt to reach a settlement of the West Penn restructuring [case]." Allegheny asked the Chairman to "reactivate" the parties' settlement discussions and promised to make a "new proposal" to resolve the matter. (Exh. D135). On October 5, 1998, Chairman Quain wrote to all the parties in the West Penn case advising them of Allegheny's request but stating that, *before* asking them to resume negotiations, he intended to meet with Allegheny to "satisfy [him]self" that it "is, in fact, serious and committed to achieving a fair settlement" and that its purported "new" proposal "represents an offer worth bringing to the negotiating table and is not merely a restatement of the company's litigation position." (Exh. D122).

185. On November 4, 1998, Allegheny announced that it had reached an agreement on the terms of a settlement with the PUC.[5] (Exh. P166). The settlement provided Allegheny with a modest increase in its CTC and a limited right to a "true-up" of its stranded cost award if it auctioned all of its generation assets before December 31, 2001. It also required Allegheny to provide immediate rate reductions in 1999 to its customers in the amount of $40 million.

186. The concessions Allegheny was forced to make in this settlement required it to record $56.6 million of additional charges in the fourth quarter of 1998 ($16.6 million in an extraordinary charge and $40 million in charges against revenues to reflect negotiated rate reductions)—all above and beyond the $450.6 million loss it had previously recorded in the second quarter. (Exh. D101, at F–12).

187. In total, and as a result of the restructuring order and the related settlement of West Penn's restructuring proceeding, Allegheny recorded $507.2 million in charges against earnings for the year ended December 31, 1998.

### L. *DQE's Asset Swap And Auction*

188. Following the PUC's ruling in the Duquesne restructuring case, DQE agreed to an asset swap with FirstEnergy Corp. ("FirstEnergy"). In this transaction, DQE has agreed to transfer to FirstEnergy its partial interests in eight generating units (including three nuclear units) that it jointly owns with FirstEnergy and others in exchange for three fossil fuel plants owned by FirstEnergy. (Marshall Direct, at 47). As a result, DQE will end up owning full interests in a total of seven

5. Despite the fact that its settlement talks with the PUC had terminated in August 1998 under hostile circumstances, Allegheny has argued that DQE acted hastily in terminating the Merger Agreement on October 5, 1998 because it should have anticipated that Allegheny would reach a favorable settlement with the PUC after that date. This contention is unavailing because, as discussed below, DQE had an absolute right to terminate the Merger Agreement on October 5, and thus had no obligation to await a settlement. Moreover, expert witnesses for both sides testified at trial that there was a statistically significant increase in the market price of Allegheny common stock on announcement of the settlement, a market reaction which shows, if anything, that the settlement was an *unexpected* favorable event that could not reasonably have been anticipated by DQE or anyone else. (Trial Tr., 10/26/99 (Stangle), at 79–80; Trial Tr., 10/28/99 (Jarrell), at 42–43).

fossil plants—the three it acquires from FirstEnergy plus four that it currently owns. (Marshall Direct, at 47–48).

189. DQE arranged the FirstEnergy swap in the fall of 1998 in order to facilitate and enhance the value received from the auction of DQE's generation assets. The ability to auction full interests in fossil fuel plants as opposed to partial interests in nuclear plants maximized the value of DQE's generation assets. (Marshall Direct, at 48–49). The asset swap transaction was approved by the PUC on July 15, 1999 as being in the public interest. (Marshall Direct, at 48).

190. On September 27, 1999, Duquesne announced that the winning bidder in its auction was Orion Power Holdings, Inc., which agreed to pay $1.705 billion for Duquesne's generation assets. The vast majority of Duquesne's stranded cost recovery (*i.e.*, over $1.1 billion) will come from the auction proceeds, rather than through collection of a CTC. Consequently, it is expected that beginning in 2001, the electricity bills of Duquesne's ratepayers will be reduced by an estimated 25 percent. (Exh. D153).

## II. *Conclusions of Law*

### A. *Principles Of Contract Construction*

191. It is well-settled that the "strongest external sign of agreement between contracting parties is the words they use in their written contract." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir.1980). Under applicable Pennsylvania law,[6] "[a] court is not authorized to construe a written contract in such a way as to modify the plain meaning of its words, under the guise of interpretation." *Best v. Realty Management Corp.*, 174 Pa.Super. 326, 101 A.2d 438, 440 (1953). Otherwise, "inter-

pretation becomes alteration of the written contract." *Mellon Bank*, 619 F.2d at 1011.

192. "A contract provision is ambiguous if it is susceptible of two reasonable alternative interpretations. *Mellon [Bank, N.A. v. Aetna Business Credit, Inc.]*, 619 F.2d [1001] at 1011 [ (3d Cir. 1980) ]. Where the written terms of the contract are not ambiguous and can only be read one way, the court will interpret the contract as a matter of law. *Stendardo [v. FNMA]*, 991 F.2d [1089] at 1094 [ (3d Cir.1993) ]. If the contract is determined to be ambiguous, then the interpretation of the contract is left to the factfinder, to resolve the ambiguity in light of extrinsic evidence." *Hullett v. ·Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir.1994). *See Patterson v. Reliance Insurance Cos.*, 332 Pa.Super. 592, 481 A.2d 947, 949 (1984) (A contract provision should be found ambiguous only "if reasonably intelligent men on considering it in the context of the entire [agreement] would honestly differ as to its meaning." (citations omitted)).

193. "Since *Mellon Bank, . . .* [the Third Circuit] has required the judge to hear the proffer of the parties and consider extrinsic evidence to determine whether there is an ambiguity . . . ." *In re New Valley Corp.*, 89 F.3d 143, 150 (3d Cir. 1996).

194. We note that this approach is practical. It answers the question, What is the most reliable, reviewable way to determine the meaning of a contract? If a judge has to decide whether words are ambiguous, he does so by listening to what the lawyers say. But if there is any merit at all to the argument on ambiguity, the judge would certainly want to see some evidence supporting the lawyer's argument. This serves the purpose of improving the reliability and consistency of the

---

**6.** Section 9.5(a) of the Merger Agreement provides, and the parties do not dispute, that the Agreement is to be "interpreted, construed and governed by and in accordance with the law of the Commonwealth of Pennsylvania without resort to the conflict of law principles thereof."

decision, and giving appellate courts a basis for review of the decision.

195. One of the examples used by the Third Circuit in *Mellon Bank* amply illustrates the point. *See* 619 F.2d at 1012 n. 12. In a commercial contract to buy 2″ × 4″ lumber, nothing could be more obvious about the dimensions of the lumber purchased, which are easily and instantly provable. When one of the parties argues, however, that commercial 2″ × 4″ lumber has almost always meant 1½″ × 3½″ for the past fifty years, and that commercial lumber with the actual dimensions 2″ × 4″ has rarely been sold since that time, the judge has a legitimate basis to make further inquiries to resolve the issue. Such inquiry could take the form of reviewing extrinsic evidence on the meaning of "2″ × 4″" in the lumber industry. Upon considering this evidence, the judge would decide whether the seemingly obvious term "2″ × 4″" was ambiguous in that case. But he could not reach this point confidently, a result always to be pursued, without the additional information—the extrinsic evidence—provided by the parties.

196. In short, the judge has to listen to the lawyers, and consider the sources of their arguments, to determine whether language is ambiguous.

197. The court may hold words of a contract to be unambiguous "after an examination of circumstances and facts demonstrate[s] that any variation of the words would be an impermissible rewriting of the contract." *Mellon Bank,* 619 F.2d at 1013 n. 13 (citing *United Refining Co. v. Jenkins,* 410 Pa. 126, 189 A.2d 574, 581 (1963)); *Merriam v. Cedarbrook Realty, Inc.,* 266 Pa.Super. 252, 404 A.2d 398, 401–02 (1978); *Best,* 174 Pa.Super. 326, 101 A.2d 438). To the extent a contract provision is found unambiguous, "a court cannot adopt a construction which conflicts with the clear meaning of the language." *Guardian Life Ins. Co. of America v. Zerance,* 505 Pa. 345, 479 A.2d 949, 953 (1984).

■ 198. In construing the language of a contract, " '[t]echnical terms and words

of art are [to be] given their technical meaning unless the context or a usage which is applicable indicates a different meaning.' " *Fischer & Porter Co. v. Porter,* 364 Pa. 495, 72 A.2d 98, 101 (1950) (alteration in original) (citation omitted). Otherwise, " 'words employed in a contract will be assigned their clear and plain, common, general, generally accepted, grammatical and ordinary, natural' or normal meaning or sense." *Independent Oil Workers v. Mobil Oil Corp.,* 441 F.2d 651, 653 n. 4 (3d Cir.1971) (citation omitted).

■ 199. To the extent the court finds, after considering the proffers of the parties, that the words in the contract are ambiguous, "such [words] should 'receive a reasonable construction and one that will accord with the intention of the parties; and, in order to ascertain their intention, the court must look at the circumstances under which the [contract] was made' … ' [T]he subject-matter of [the parties'] negotiations may affect the meaning of the words they employ.' " *United Refining Co. v. Jenkins,* 410 Pa. 126, 189 A.2d 574, 580 (1963) (citations omitted).

■ 200. When a contract is ambiguous, extrinsic evidence is admissible to show the parties' intention. *See In re New Valley Corp.,* 89 F.3d 143, 150 (3d Cir. 1996) (extrinsic evidence admissible both to identify and to resolve ambiguity); *Hutchison,* 513 Pa. at 201, 519 A.2d 385 (admitting parol evidence); *Bear Stearns* slip op. at 155 (admitting extrinsic evidence to determine parties' intent). "Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *In re New Valley Corp.,* 89 F.3d at 150.

B. *DQE's Termination Under Section 8.2(a)*

1) *Measurement Of A Material Adverse Effect (MAE) Arising From Application Of Restructuring Legislation*

201. As previously noted, DQE was permitted to terminate the Agreement on

October 5, 1998 if the Merger had not consummated by that date, unless "on October 5, 1998," each of the conditions to the Merger (other than those relating to receipt of required governmental approvals) had been satisfied—including the condition in Section 7.3(a) that the MAE Representation in Section 5.1(f) be true and correct.

202. Section 5.1(f) is the provision of the Agreement requiring the parties to represent to one another that no development has occurred from a specified date prior to the Agreement being signed that is reasonably likely to have a MAE on the specified aspects of the company's business.

203. Section 5.1(a) of the Merger Agreement defines a MAE as follows:

> "Material Adverse Effect" means, with respect to any Person, a material adverse effect on the financial condition, properties, operations, business or results of operations of such Person and its Subsidiaries taken as a whole; *provided, however,* that any such effect resulting from ... the application of the Pennsylvania Restructuring Legislation ..., which affects both [DQE] and its Subsidiaries, taken as a whole, and [Allegheny] and its Subsidiaries, taken as a whole, shall only be considered when determining if a Material Adverse Effect has occurred to the extent that such effect on one such party exceeds such effect on the other party.

(Exh. D1).

204. The event which is alleged to have resulted in a MAE here arises from the application of the Restructuring Legislation. Because the Agreement contains a proviso for a MAE arising from such an event, we must first determine how the effect of the event should be measured before determining its materiality.

205. The language relevant to this initial determination appears in latter portion of Section 5.1(a):

> any such effect resulting from ... the application of the Pennsylvania Restruc-

turing Legislation ..., which affects both [DQE] and its Subsidiaries, taken as a whole, and [Allegheny] and its Subsidiaries, taken as a whole, shall only be considered when determining if a Material Adverse Effect has occurred to the extent that such effect on one such party exceeds such effect on the other party.

206. Allegheny argues that this language is unambiguous and according to its plain and ordinary meaning can be interpreted as follows.

207. First, Allegheny contends that the language "which affects both [DQE] and its Subsidiaries, taken as a whole, and [Allegheny] and its Subsidiaries, taken as a whole" means that only the alternative results in the event of a Merger which was included in the parties' stand-alone orders can be considered. More specifically, Allegheny contends that the only application of the Restructuring Legislation that "affects both" Allegheny and DQE is the restructuring scenario that is applicable if the Merger occurs. If the Merger goes forward, Allegheny argues, the stand-alone order of one company would not affect the other.

208. Second, Allegheny argues that the language "shall only be considered when determining if a Material Adverse Effect has occurred to the extent that such effect on one such party exceeds such effect on the other party" means that one must take the difference in the amount of DQE's potential write-off under an alternative merger scenario and the amount of Allegheny's write-off under an alternative merger scenario and apply such difference to Allegheny to determine if Allegheny has suffered a MAE. Allegheny contends, for example, that "if West Penn took a write off of $50 and Duquesne took a write off of $25 in the merger restructuring scenario, then the MAE issue under this definition would be whether the $25 difference in the write off was materially adverse to Allegheny and its subsidiaries taken as a whole." Allegheny's Proposed Findings of Fact and Conclusions of Law ("Allegheny's

FOF") (Doc. No. 108) at Conclusions of Law ¶ 14.

209. We disagree with Allegheny's interpretation on both counts.

210. After considering the language of the provision and the proffers of the parties, we find that reasonable minds could differ as to the meaning of this provision.

211. The extrinsic evidence submitted by the parties reveals that the positions of the parties at the time of the negotiations of the contract were at polar opposites to their present positions in this litigation. Essentially, Allegheny favored a clause which would allow it to escape from the merger if DQE suffered adverse effects as a result of the future PUC regulatory rulings, as both parties anticipated. DQE favored contract language which would disregard the effects of future PUC regulatory rulings, thus making it more difficult to terminate the contract.

212. In the negotiations, for example, Allegheny favored a MAE provision that would consider the effect of a regulatory ruling solely on a particular company in a vacuum with no consideration of the other company's ruling because it was concerned with the potential that DQE would receive a particularly adverse restructuring order in connection with its high cost nuclear plants.

213. DQE, on the other hand, was also concerned with a particularly adverse restructuring order in connection with its nuclear plants, and thus argued for a provision which specifically excluded the consideration of any effect of a restructuring order by the PUC when determining whether a MAE had occurred.

214. After several back and forths, the parties agreed on the existing language which the court finds to be a compromise which did not adopt the position of either party.

215. Although Allegheny contends that it ultimately gave in, resulting in the combined entity formula as originally proposed by DQE making its way into the final agreement, the existing language does not support such a conclusion.

216. And, unfortunately, the evidence presented by the parties, including the back and forth correspondences, provides little insight as to what was the final intended meaning the parties agreed to.

217. With that in mind, we begin with the first portion of the provision. Allegheny's reading of this language is extremely narrow—i.e., that only an order under a merger scenario can be considered while the stand-alone orders are to be disregarded.

218. Although Allegheny's position is not without some basis, a broader and more logical reading of the "affects both" language is that the parties intended to recognize that the application of the Restructuring Legislation would affect both Allegheny and DQE, as it does all Pennsylvania electric utilities, and that the effect of such legislation would only be considered to the extent that such effect on one party exceeds the effect on the other.

219. In other words, the Restructuring Legislation affects both parties in that both had to file a restructuring application with the PUC that would result in a stranded cost award. If the effect of this application of the Restructuring Legislation, which "affects both" DQE and Allegheny, is alleged to have resulted in a MAE as to one of the parties, then such effect will only be considered to the extent such effect on that party exceeds the effect of the legislation on the other party.[7]

220. Indeed, a broader reading is more logical under the existing facts and circumstances as only the application of the Restructuring Legislation which had an

---

7. Allegheny also argues that the provision must be interpreted its way otherwise the word "both" would be read out of the agreement. This argument is unconvincing. The absence of the word "both" neither supports nor detracts from either interpretation as the provision could still be interpreted either way.

"effect." as of October 5, 1998 could be considered. The crucial date is October 5, 1998 and the only application of the legislation which had an actual effect as of October 5, 1998 was each party's stand-alone orders. Under GAAP, each party was required to record the effect of the stand-alone orders in their financial statements at that time and report such effect in filings with the SEC. Thus, these orders were the only orders under the Restructuring Legislation which had economic substance as of October 5, 1998, because at that time, the merger scenario was a hypothetical which could not eventuate until some later date.

221. As to the second portion of the provision, "to the extent that such effect ... exceeds ...", we disagree that the plain meaning of this language supports Allegheny's interpretation.

222. After considering the language of the provision and the proffers of the parties, we also find that this language is ambiguous.

223. Contrary to Allegheny's contention, it appears that Section 5.1(a) requires that consideration be given to more than merely the difference in the companies' write-offs.

224. We hold instead that Section 5.1(a) requires a comparison of the effects of the Restructuring Legislation as between the two companies. Such a test is more qualitative and based on economic reality than the test proposed by Allegheny.

225. In other words, it would defy economic reality to simply reduce Allegheny's write-off by the amount of DQE's write-off and apply that number to numbers in Allegheny's financial statements. Such a test would artificially reduce the effect of the Restructuring Legislation on Allegheny and obscure a comparison of the true effect of the legislation as between the two companies.

226. Allegheny's argument in this regard also reveals an inconsistency in its position. On the one hand, Allegheny argues that the first portion of the formula, "which affects both", requires that a merger order be used in the analysis because a merger was what was contemplated and only a merger order would affect the merged entity. When applying the effect of such an order, however, Allegheny argues that the "to the extent that such effect ... exceeds" language requires that DQE's write-off under a merger order be subtracted from Allegheny's write-off under a merger order and that such difference be applied only to Allegheny's numbers as a stand-alone company. Indeed, this inconsistency is inherent under Allegheny's approach as there would be nothing to compare in a merged entity scenario because both write-offs would be recorded by the merged entity.

227. Allegheny's interpretation could not have been what the parties intended as it would have deprived the parties of any meaningful way to escape the contract, even where the adverse effect to the other party was catastrophic. Such approach defies logic and is not supported by the evidence.

228. In sum, we find that the definition of a MAE in Section 5.1(a) requires one to consider the effect that each company's stand-alone restructuring order had on it as of October 5, 1998, and to compare the effect as between the two. Thus, if the effect of Allegheny's stand-alone order on Allegheny was greater than the effect that DQE's stand-alone order had on DQE, and such greater effect was materially adverse, then Allegheny will have suffered a MAE as defined in the Agreement.

229. This interpretation results in the only test that is reasonable, and logical from a financial analysis standpoint, that also does not conflict with Section 5.1(a)'s language.

230. Moreover, this interpretation and application of the language is consistent with a logical compromise by the parties as the resulting test exhibits characteristics

of both parties' initial positions by mandating that one had to exceed the other and that it be materially adverse to that party.

231. For example, under this test one would not consider one party's restructuring order in a vacuum without taking into account the other party's order as was originally proposed by Allegheny. Thus, if Allegheny were denied 50% of its stranded costs and DQE were denied 50% of its stranded costs, Allegheny could not claim that DQE suffered a MAE as easily as it could have under its original proposal because it suffered a similar adverse effect. On the other hand, if DQE were denied 50% of its stranded costs and Allegheny were denied only 20% of its stranded costs, DQE could not claim, as it could have under its original proposal, that it had not suffered a MAE because the PUC's ruling could not be considered. Nor could DQE artificially dilute the effect of its ruling by subtracting from its order the amount of Allegheny's order or by applying it to the combined numbers of a not yet merged entity.

2) *Definition Of "Materially Adverse Effect"*

232. A MAE is defined in Section 5.1(a) as follows: "Material Adverse Effect" means, "with respect to any Person, a material adverse effect on the financial condition, properties, operations, business or results of operations of such Person and its Subsidiaries taken as a whole . . ."

233. Although the definition refers to the term being defined as the term's definition—i.e., a tautology—the language used is not void of a common and generally accepted meaning.

234. The term "material" means "having real importance or great consequences." Merriam–Webster's Collegiate Dictionary at 717 (10th ed.1999).

235. The term "adverse" means "causing harm." *Id.* at 17.

236. The term "effect" means "something that inevitably follows an antecedent (as a cause or agent)." *Id.* at 367.

237. With the exception of the word "material", we find that these terms have a common and plain meaning and are not ambiguous.

238. Although there is a common understanding of what the term "material" encompasses, the inherent relativity of this word makes it ambiguous in the absence of any qualifying language.

239. Here, the Agreement provides no further explanation as to how "material" is to be interpreted. Nor does the Agreement provide any financial benchmarks from which to measure materiality.

240. Moreover, the parties presented no evidence which would indicate that they had any particular or specialized meaning in mind.

241. In the absence of any qualifying language or evidence as to the parties' intent, we are left to determine what would be an interpretation that is reasonable under the circumstances.[8]

---

8. At various times throughout the litigation, DQE argued that a GAAP definition of materiality is the appropriate definition to use in a MAE analysis primarily because Section 5.1(e) of the Agreement entitled "Reports; Financial Statements" requires the parties to prepare their financial statements in accordance with GAAP. Although DQE has apparently now abandoned this argument, as it has not restated this position in its proposed findings of fact and conclusions of law, we hold that a GAAP definition is not the operative definition of material in Section 5.1(a). Section 5.1(e) reflects the parties' obligations as public companies to make their public filings of financial information in accordance with GAAP. One simply cannot infer that the parties intended that a GAAP definition of materiality apply in Section 5.1(a) because of a single reference to GAAP in another section of the Agreement which was made in a specific and narrow context. Indeed, DQE presented no evidence that the parties intended to incorporate a GAAP materiality standard into Section 5.1(a). Had they intended to do so, the parties could have easily included such a reference. Moreover, as both parties' accounting experts testified, GAAP incorporates a particularly low materiality threshold which focuses on whether information might influ-

242. Our starting point is with the common and plain meaning of the word "material." In a case such as this one, which involves the merger of two large, publicly held companies, and where the word "material" is not defined except by reference to itself, we hold that when determining whether an event is material to one of the parties, in addition to the common and plain meaning of that word, one must consider the event in light of the size and nature of the transaction and the nature of the parties' businesses. For example, the determination of whether the effect of Allegheny's restructuring order was material to Allegheny's results of operations would, contrary to DQE's position throughout this litigation, have to take into account more than just the effect on Allegheny's 1998 operating income. *See e.g., Northern Heel Corp. v. Compo Indus., Inc.,* 851 F.2d 456, 463 (1st Cir.1988) ("Materiality ... is not what a disappointed party says it is; rather it demands an objective cross-matching of the significance of a fact to the essence of the transaction in question, and requires a showing of the potentially adverse effect of the former on the latter.").

3) *Application Of MAE Provision*

243. After considering all the evidence and testimony and taking into account the size and nature of the transaction and the business of the parties, we hold that as of October 5, 1998, the effect of Allegheny's stand-alone restructuring order on Allegheny was greater than the effect of DQE's stand-alone restructuring order on DQE, and that such greater effect was materially adverse.

244. For example, as was set forth in the court's findings of fact, the Allegheny write-off, measured in absolute terms, is more than three times the size of the DQE write-off. Allegheny is a somewhat larger company than DQE; its total book value of common equity exceeded DQE's book val-

ue of common equity by 37 percent at year end 1998. Yet Allegheny's write-off was more than 220 percent larger than (that is, more than triple the size of) DQE's write-off. Also, Allegheny's 1998 write-off completely eliminated Allegheny's net income for the year and caused Allegheny to suffer a net loss. In percentage terms, its write-off amounted to 105 percent of the company's 1998 net income. This compares to 42 percent for DQE. Thus, as a percentage of 1998 net income, the Allegheny write-off is roughly two-and-one-half times larger than the DQE write-off.

245. Moreover, the PUC disallowed recovery of approximately $1 billion of Allegheny's stranded costs. In contrast, DQE has been permitted to recover all but $142 million of its stranded costs. As a result of the $1 billion disallowance, Allegheny was denied the opportunity to receive a large stream of guaranteed future revenues that it had been receiving prior to deregulation and that it would have been entitled to recover—regardless of whether future market prices for electricity go up or down—had its stranded cost request been granted by the PUC.

246. These results must be considered materially adverse under the contract and under any reasonable definition that might be applied to the word.

4) *As Of October 5, 1998*

247. The permissible grounds for terminating the Merger Agreement prior to consummation of the Merger were set forth in Article VIII (comprised of Sections 8.1 through 8.5) of the contract. Section 8.2(a)(ii) of Article VIII provided that DQE could terminate the Agreement immediately on October 5, 1998—without any extension—unless, on October 5, 1998, each of the conditions set forth in Article VII (Sections 7.1 through 7.3), other than the condition relating to the receipt of required regulatory approvals, had been

ence any user of the financial statements. Such a test would not comport with the par-

ties' intent that the MAE provision should not provide either party with an easy out.

satisfied or waived, or "[could] readily be satisfied." (Exh. D1).

248. Section 7.3(a) required that all of the contractual representations and warranties made by Allegheny "be true and correct . . . as of the Closing Date [ ] except to the extent that any such representation or warranty expressly speaks as of an earlier date . . . ." (Exh. D1).

249. DQE contends that because Section 5.1(f) required Allegheny to warrant that there had not been a MAE "since the Audit Date", the earlier date provision in Section 7.3(a) required the such warranty to be true and correct as of October 5, 1998, otherwise DQE had an unequivocal right to terminate the Agreement.

250. DQE maintains that it properly terminated the Agreement pursuant to Section 8.2(a) because "on October 5, 1998," Allegheny had not satisfied, and could not satisfy (readily or otherwise), the condition in Section 7.3(a) (the "MAE Condition") that the MAE Representation made in Section 5.1(f) was "true and correct."

251. Allegheny argues, however, that it was not required to make an MAE representation on October 5, 1998 because the "since the Audit Date" language in Section 5.1(f) does not fall within Section 7.3's earlier date exception. To conclude otherwise, Allegheny argues, would result in a reading of the language as "as of the Audit Date and every day after." Allegheny maintains, therefore, that it was only required to represent that the representation in Section 5.1(f) could be "readily satisfied" by April 5, 1999 (the last day of an extension under Section 8.2(a)).

252. Allegheny's argument is undermined by the express language of Section 7.3(a), which provides that Allegheny's contractual representations must be true *prior to* the Closing Date where, as in this case, the representation at issue, *i.e.,* the MAE Representation in Section 5.1(f), "expressly speaks as of an earlier date." The representation in Section 5.1(f) refers to a point in time—"since" the Audit Date. "Since" must be accorded its plain and ordinary meaning, *i.e.,* "from a definite past time until now." Merriam–Webster's Collegiate Dictionary at 1094 (10th ed.1999). Here, Allegheny failed to satisfy, and could not readily satisfy, the MAE Condition because as of October 5, 1998, it had already been adversely affected by the West Penn restructuring order to a material extent, and therefore had suffered a MAE. Accordingly, it was in material breach of its express contractual representation in Section 5.1(f) that no MAE had occurred "since" the Audit Date.

253. Allegheny argues in the alternative that it had provided DQE with adequate assurances as of October 5, 1998 that the effect of the PUC's order could readily be remedied.

254. We disagree. The PUC had entered a final order in West Penn's case and even though Allegheny represented to DQE that it would get a better deal in a settlement in connection with its lawsuit against the PUC, settlement talks had broken down at that time rendering its assurances no more that speculation as to what it might achieve at some undetermined future date. Moreover, even if it could have been known as of October 5, 1998 that productive talks would resume, there was no indication as to how much, if any, additional stranded cost Allegheny would ultimately end up with or if the PUC would change its position and allow Allegheny to auction its generation subsequent to the final order that had been entered. In sum, the evidence does not support a finding that Allegheny's $1 billion shortfall in stranded cost recovery (i.e., the MAE) could readily be satisfied as of either October 5, 1998 or any date thereafter.

255. Furthermore, even if one could have known as of October 5, 1998 that Allegheny would obtain a settlement in November 1998 which allowed it to later sell its generation, DQE would have had little reason to believe that Allegheny would go through with such a sale based

on Allegheny's repeatedly staunch position that it wanted to stay in the generation business and its refusal to commit to a timetable for a sale.

### C. *Availability Of Section 8.2(a) To DQE*

256. Allegheny contends that DQE breached Section 6.5(c) of the Agreement which required both parties "to cooperate with each other and use . . . all commercially reasonable efforts . . . to obtain as promptly as practicable all . . . approvals" necessary to consummate the Merger. (Exh. D1.) More specifically, Allegheny contends that DQE prevented all regulatory approvals from being obtained by October 5, 1998 when it informed the FERC, the SEC and the DOJ in July 1998 that it did not intend to consummate the Merger under the current circumstances.

257. Allegheny argues, therefore, that DQE could not terminate the Agreement pursuant to Section 8.2(a) because termination under this section is "not [ ] available to any party that has breached in any material respect its obligations under [the] Agreement in any manner that shall have proximately contributed to the occurrence of the failure of the Merger to be consummated." (Exh. D1.)

258. While DQE's actions in notifying the FERC, the SEC, and the DOJ of the parties' disagreement and its position on the likelihood of merger consummation may have delayed these bodies from taking final action, we do not find that DQE's conduct constituted a breach of the Agreement.

259. It would have been imprudent for the parties to not inform the regulatory bodies of such a material event, even though such communications were likely to cause some delay.

260. Indeed, there is no evidence of bad faith on DQE's part. In its letter to

the FERC, DQE stated that it did not oppose the issuance of an order on the merger application and such order was issued shortly thereafter in September 1998. There is no evidence that DQE's subsequent rejection of the FERC's September order, which it had a right to do, was based on anything other than legitimate business reasons.

261. Moreover, the evidence shows that DQE's Board of Directors met in July and received presentations from DQE's management and the company's independent financial advisor on the effect of West Penn's restructuring order on Allegheny before it made the decision to issue the July letters.

262. In any event, even if DQE's actions conflicted with its duties under Section 6.5(c), any delay that was caused by such conduct did not proximately contribute to the failure of the Merger being consummated by October 5, 1998. The evidence establishes that it was essentially an impossibility that the parties could have satisfied the PUC's and the FERC's market power mitigation requirements prior to April 5, 1999—i.e., either join a fully functioning ISO by June 30, 2000 (which Allegheny agrees could not be done) or divest DQE's Cheswick facility.

263. Accordingly, we find that DQE did not breach the April 5, 1997 Agreement as it properly terminated such agreement pursuant to Section 8.2(a).[9]

An order consistent with these findings of fact and conclusions of law will be entered.

### *ORDER*

In accordance with the accompanying findings of fact and conclusions of law, the court finds that defendant DQE, Inc., did not breach the April 5, 1997 Agreement And Plan Of Merger. Accordingly, we find in favor of DQE, Inc., and against

---

**9.** Because we find that DQE properly terminated the Agreement pursuant to Section 8.2(a), we need not consider whether the termination was also proper pursuant to Section 8.3(b)(ii).

Allegheny Energy, Inc., on all claims and all requests for injunctive relief.

**IT IS HEREBY ORDERED** that **JUDGMENT IS GRANTED** in favor of defendant DQE, Inc., and against plaintiff Allegheny Energy, Inc.

**SO ORDERED** this 3 day of December, 1999.

The Clerk is directed to mark this case closed.